Erik **ARNESON**, individually and in his official capacity as Executive Director of the Office of Open Records, and the Senate Majority Caucus, Petitioners

v.

Thomas W. **WOLF**, in his official capacity as Governor of the Commonwealth of Pennsylvania, Department of Community and Economic Development, and Office of Open Records, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 11, 2015.

Decided June 10, 2015.

Joel L. Frank, West Chester, for petitioner Erik Arneson.

Matthew H. Haverstick, Philadelphia, for petitioners Erik Arneson and Senate Majority Caucus.

Charles R. Brown, Harrisburg, for respondent, Office of Open Records.

Kenneth L. Joel, Chief Deputy Attorney General, and Jonathan D. Koltash, Deputy Attorney General, Harrisburg, for respondents Thomas W. Wolf and Department of Community and Economic Development.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, BONNIE BRIGANCE LEADBETTER, Judge, RENÉE COHN JUBELIRER, Judge, MARY HANNAH LEAVITT, Judge, P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge PATRICIA A. McCULLOUGH.

In this case, the Court discerns legislative intent to determine whether the Executive Director of the Office of Open Records (OOR), a unique and *sui generis* independent body, was meant to be independent from the executive branch and insulated from the Governor's constitutional power to remove appointees at-will.

The legal concept of "independent administrative agency" has generated a wealth of commentary, but the defining characteristic of an independent agency is precisely that—the agency is independent in the sense that it is free from the control and influence of the chief executive. In this vein, our courts have recognized that if the legislature creates a public office, it may impose terms regarding tenure and removal as it sees fit, and if the legislature intends for an agency to be "independent," then the legislature has the authority to circumscribe the Governor's removal power.

No one disputes that the OOR is a unique administrative agency and that the Executive Director, as the head of this agency, assumes an inimitable role in its operations. The OOR is a quasi-judicial

tribunal tasked with the delicate function of applying the statutory standards of the Right–to–Know Law (RTKL).[1] The RTKL is a ground-breaking overhaul in the law concerning governmental records and documents that must be disclosed to the public. The current RTKL marked a significant shift from the former Right to Know Act of 1957,[2] which imposed the burden on the requester to show a record was subject to access, and now requires that government agencies and officials establish why it is not.

Significantly, the OOR's statutory obligations include determining whether even documents of the Governor, and the executive branch in general, should be disclosed to the public; hence, the two entities can often be diametrically opposed for purposes of the RTKL. The OOR is structurally and functionally independent from the executive branch; the Executive Director oversees the OOR, its quasi-judicial functions, and has a statutorily-fixed term that exceeds the appointing Governor's term. The Court considers these and additional factors in ascertaining whether the legislature, in enacting a RTKL designed to promote public access to information, expressed intent to limit a Governor's power to remove the Executive Director except for cause.

After careful review, we conclude that the legislature has expressed such intent.

### Facts/Procedural History

On February 18, 2015, the parties submitted a joint stipulation of facts and exhibits, agreeing to the following.

On January 13, 2015, then-Governor Tom Corbett lawfully appointed Erik Arneson to be the Executive Director of the OOR, designating his tenure as January 13, 2015, through January 13, 2021, "and until your successor is appointed and qualified, if you shall so long behave yourself well." (Stipulation of Facts, Ex. B.) Arneson received his commission on that same date, and, on January 16, 2015, he took the oath of office.

On January 20, 2015, Governor Thomas W. Wolf officially became the new Governor of Pennsylvania. Governor Wolf authored a letter dated January 20, 2015, and delivered it to Arneson on January 22, 2015. This letter informed Arneson that Governor Wolf was terminating his employment as the OOR's Executive Director immediately.[3] (Stipulation of Facts, Ex. D.)

On January 26, 2015, Arneson, individually and in his official capacity as Executive Director of the OOR, and the Senate Majority Caucus (together, Arneson) filed a petition for review in the nature of a

---

**1.** Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

**2.** Act of June 21, 1957, P.L. 390, *formerly* 65 P.S. §§ 66.1–66.9, repealed by the Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

**3.** In the letter, Governor Wolf said that he has,

> serious concerns regarding [Arneson's] recent appointment to the OOR Executive Director position by former Governor Corbett. The process leading to [Arneson's] appointment lacked transparency, was of question-

able timing and appears to have been rushed through. It is precisely this style of governing that causes Pennsylvania's citizens to become skeptical and lose trust that their state government is acting in their best interest.

(Stipulation of Facts, Ex. D.)

Governor Wolf also thanked Arneson for his years of public service and stated that for the position of Executive Director, his administration "will engage in a comprehensive and fully transparent executive search process that is open to all interested applicants." (*Id.*)

complaint for mandamus and declaratory relief in this Court's original jurisdiction against Thomas W. Wolf, in his official capacity as Governor of the Commonwealth of Pennsylvania, the Department of Community and Economic Development (DCED), and the OOR (together, Governor Wolf).

In his petition for review, Arneson pled a mandamus count and a count for declaratory relief, contending that Governor Wolf terminated his employment as the Executive Director of the OOR in violation of the Pennsylvania Constitution and the RTKL. In his prayer for relief, Arneson seeks, among other things: (1) a writ of mandamus restoring him to the position of Executive Director; (2) backpay and benefits; (3) a declaration that Governor Wolf violated the Pennsylvania Constitution and the RTKL; and (4) an injunction permanently enjoining Governor Wolf from making further attempts to remove him as Executive Director without cause.

Following the filing of pleadings and applications by the parties, including Arneson's application for a special and preliminary injunction, President Judge Dan Pellegrini issued an order dated February 4, 2015. In this order, President Judge Pellegrini noted that Arneson withdrew his application for a special and preliminary injunction and ordered that the case be listed for the March argument session before the Court *en banc.* President Judge Pellegrini further directed the parties to file cross-motions for summary relief on stipulated facts and briefs.

The parties then filed cross-motions for summary relief and briefs in support of their respective positions.[4]

## Discussion

In his brief, Arneson contends that by enacting this new RTKL and creating the position of Executive Director, the legislature expressed its intent to limit a Governor's removal power and that in accordance with principles of statutory construction, the Executive Director can only be removed for cause. Arneson argues that to limit a Governor's removal power, explicit statutory language is unnecessary, and that the basic structure and specific provisions of the RTKL clearly reflect the legislature's general intent to curtail a Governor's power to remove an Executive Director at his pleasure.

In advancing this argument, Arneson relies principally upon four factors: (1) the Executive Director serves for a mandatory six-year term that exceeds or staggers the four-year term of the initially-appointing Governor; (2) the legislature barred an Executive Director from seeking election or appointment to a political office during his tenure as Executive Director and for one year after his tenure; (3) the OOR is a unique and independent administrative agency that reviews other agency's actions under the RTKL, including the Office of the Governor; and (4) the goal of the RTKL is to promote access to official government information and this goal can only be accomplished if the Executive Director and the OOR remain independent from the Governor and the Executive Director is not under the pressure of being removed at the Governor's pleasure.

In addition, Arneson asserts that the Executive Director performs quasi-ju-

---

4. The Majority Caucus of the Pennsylvania House of Representatives (Majority Caucus) and the Pennsylvania Newsmedia Association (Newsmedia Association) have filed *amicus curiae* briefs in support of Arneson. The arguments in these briefs parallel those made by Arneson in his brief. More specifically, the Majority Caucus and the Newsmedia Association detail their interests in this case and emphasize that the OOR was established as an independent office to ensure transparency in government.

dicial duties in his role at the OOR and cannot be removed absent cause based upon separation of powers principles. For support, Arneson cites the expression of rationale advocated by former Chief Justice Jones in his special concurrence[5] in *Bowers v. Pennsylvania Labor Relations Board*, 402 Pa. 542, 167 A.2d 480 (1961).

In his brief, Governor Wolf argues that there is no explicit statutory language governing the removal of the Executive Director, and, therefore, it is presumed that the Executive Director can be removed absent cause. Governor Wolf contends that even though the six-year term for an Executive Director is longer than the appointing Governor's term, it is still a term of years and does not overcome the presumption that an appointee can be removed at-will.

Governor Wolf also advocates that the RTKL does not expressly designate the OOR as an "independent agency," and states that the OOR is housed by statute within the DCED, a department of the executive branch. Governor Wolf further dismisses Arneson's claim that the OOR needs to be independent from the Governor and the executive branch, contending that the OOR's decisions are not accorded any deference when they are reviewed on appeal; the OOR's decisions are automatically stayed pending appeal; this Court can act as fact-finder on appeal; and the judiciary, rather than the OOR, serves as the independent decision-maker in requests for records.

Finally, Governor Wolf contends that there is no "quasi-judicial" exception to his removal power under the Pennsylvania Constitution and that, even if one existed, the RTKL does not create a "quasi-judi-cial" entity or a "quasi-judicial" Executive Director. Governor Wolf notes that Chief Justice Jones' commentary in *Bowers* merely represented the view of one Justice and did not garner the joinder of any other Justices in that case.

## Analysis

■ Our determination of whether the Governor can remove the Executive Director of the OOR without cause is necessarily premised on an analysis of the Pennsylvania Constitution and established precedent.

Article VI, Section 7 of the Pennsylvania Constitution concerns public officers such as the Executive Director of the OOR and provides:

> All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. **Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed.** All civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate.

PA. CONST. article VI, § 7 (emphasis added).

This section of the Pennsylvania Constitution is read in conjunction with Article VI, Section 1, which discusses the appointment of officers not provided for in the

---

**5.** A special concurrence is where an author of a majority opinion writes separately as a single judge unconstrained by majority authorship and the majority's rationale. *See Com-* *monwealth v. King*, 618 Pa. 405, 57 A.3d 607, 633–34 & n. 1 (2012) (Saylor, J., concurring specially). ·

Constitution and states that: "**All officers, whose selection is not provided for in th[e] Constitution, shall be elected or appointed as may be directed by law.**" PA. CONST. article VI, § 1 (emphasis added). Article VI, Section 1 is applicable to the matter at hand because the Executive Director's succession of appointment is not provided for in the Constitution; rather, it is set forth in the RTKL as follows: "Within 90 days of the effective date of this section, the Governor shall appoint an executive director of the office who shall serve for a term of six-years.... The executive director may serve no more than two terms." Section 1310(b) of the RTKL, 65 P.S. § 67.1310(b).

The correlation between an appointer's removal power in Article VI, Section 7, and the legislative power to create appointed offices in Article VI, Section 1, has long been recognized by our Supreme Court:

It is established in this State beyond respectable controversy that, **where the legislature creates a public office, it may impose such terms and limitations with reference to the tenure or removal of an incumbent as it sees fit. Whether an appointed civil officer holding a legislatively created office is subject to removal at the pleasure of the appointing power depends upon legislative intent, to be gleaned from the statute creating or regulating the office.**

*Commonwealth ex rel. Sortino v. Singley,* 481 Pa. 367, 392 A.2d 1337, 1339 (1978) (emphasis added) (quotations and citations omitted). *See Watson v. Pennsylvania Turnpike Commission,* 386 Pa. 117, 125 A.2d 354, 356 (1956) ("There is nothing in the Constitution prohibiting such [legisla-

tive] action while, on the other hand, Article XII, Section 1 [now Article VI, Section 1], expressly admits of it."). Indeed, our Supreme Court "has consistently recognized that, when the General Assembly creates a public office, it may impose terms and limitations on the removal of the public officer so created." *Burger v. School Board of McGuffey School District,* 592 Pa. 194, 923 A.2d 1155, 1164 (2007) (citations omitted).

As the judicial branch, it is this Court's constitutional mandate to decipher legislative intent. In *Bowers,* our Supreme Court instructed: "[W]hether the legislature in creating an appointive office has evidenced by its enactment an intention that the tenure of the appointee shall not be subject to termination at the pleasure of the appointing power presents a pure question of statutory construction which is peculiarly and exclusively the function of the judiciary to resolve." 167 A.2d at 482.

There has never been a holding by the Supreme Court or this Court that a statute must explicitly say "the officer may only be removed for cause" to find a legislative limitation on removal. In this case, the legislature did not specifically state in the RTKL that the Executive Director could be removed only for cause. Conversely, the legislature did not state in the RTKL that the Executive Director serves at the pleasure of the Governor. Accordingly, this Court must analyze the RTKL and relevant statutes to discern the legislature's intent on the topic. *Singley,* 392 A.2d at 1339; *Bowers,* 167 A.2d at 482; *Venesky v. Ridge,* 789 A.2d 862, 864 (Pa. Cmwlth.2002) (*en banc*), *aff'd without opinion in* 570 Pa. 461, 809 A.2d 899 (2002).[6]

6. Although not raised by the parties, the Dissent repeatedly references Article IV, Section

8(a) of the Pennsylvania Constitution, PA. CONST. art. IV, § 8(a), to suggest that an Exec-

## Fixed Term

We begin by recognizing that section 1310(b) of the RTKL creates the office of the Executive Director and sets forth a fixed term for the position:

(b) **Executive director.**—Within 90 days of the effective date of this section, **the Governor shall appoint an executive director of the office who shall serve for a term of six years.** Compensation shall be set by the Executive Board established under section 204 of the act of April 9, 1929 (P.L.177, No.175), known as The Administrative Code of 1929. **The executive director may serve no more than two terms.**

Section 1310(b) of the RTKL, 65 P.S. § 67.1310(b) (emphasis added). The Executive Director's fixed, six-year term exceeds the four-year term of the appointing Governor. Similarly, by virtue of the two-term or twelve-year limit proscribed in the statute, a reappointed Executive Director will outlast any two-term Governor.

In *Watson*, the governor appointed the plaintiff in 1952 as a member of the Pennsylvania Turnpike Commission (Commission) for a term expiring in 1961. In 1955, a newly-elected Governor dismissed the plaintiff in reliance on his constitutional authority under then Article VI, Section 4—now Article VI, Section 7—of the Pennsylvania Constitution. Our Supreme Court analyzed the statute creating the Commission and legislative intent to determine "whether the Governor had the power ... to remove from office, at his pleasure, a member of the [Commission] during the fixed term of office for which he was appointed and confirmed." 125 A.2d at 355.

Our Supreme Court noted that pursuant to statute, the Commission consisted of four members, who shall continue in office for terms of four, six, eight, and ten years, respectively. The court concluded that the composition of the Commission and the nature of the individual terms was a significant factor in deciding whether the legislature intended to limit the Governor's removal power. In particular, the court determined:

The purpose of the foregoing provision as to the terms of office of the Commissioners ... is patent. It was designed so that, by the prescribed rotation, the terms of three of the four appointed members of the Commission would always be current.... Were the Commissioners to be held removable at the pleasure of the Governor, the carefully expressed scheme of term rotation would be effectually nullified. If it be countered that the Governor, in appointing to a vacancy created by his dismissal of a Commissioner, would respect the spirit of the Act ... the answer is that the power so attributed to the Governor would still violate the plain intendment

utive Director has to be confirmed by the Senate. (*See* Dissent op. at 403–04, 406). However, Article IV, Section 8(a) merely allows the legislature to create a public office and require Senate confirmation. See PA. CONST. art. IV, § 8(a) ("The Governor shall appoint a Secretary of Education **and such other officers as he shall be authorized by law to appoint.** The appointment of the Secretary of Education **and of such other officers as may be specified by law,** shall be subject to the consent of two-thirds or a majority of the members elected to the Senate **as is specified**

**by law.**") (emphasis added). The simple fact that the legislature can vest the Governor with sole appointment authority (Article VI, Section 7) or require appointment plus confirmation (Article IV, Section 8) only serves to highlight that the legislature controls, as a general matter, the manner in which public officers are appointed to office. In this case, the legislature chose not to require Senate confirmation for the position of Executive Director; it was within the legislature's prerogative to do so; and Article VI, Section 8 is irrelevant to our analysis.

of the Act. He could render all of the offices vacant at one time which, obviously, the Act was specifically designed to make impossible.

125 A.2d at 357.

■ Accordingly, the court in *Watson* concluded that the prescribed rotation of the Commissioners' terms, in and of itself, evidenced the legislature's intent that the Commissioners only be removed for cause. The Court clearly discerned legislative intent by focusing on the net effect of allowing the Governor to remove the Commissioners without cause. In essence, such unbridled power by the governor to remove the Commissioners without cause would nullify the intent that the Commissioners' terms overlap the Governor's terms of office. This legal tenant originating in *Watson* has been described as the "fixed, staggered rule," *Singley*, 392 A.2d at 1339, and may be summarized as follows. "[W]here public officers are appointed to a legislatively created commission or board, for a statutorily fixed term with staggered expiration dates, the presence of the staggered term provision indicates a legislative intent that the holders of the office are not to be removed at the pleasure of the appointor." *Naef v. City of Allentown*, 424 Pa. 597, 227 A.2d 888, 890 (1967).

In *Venesky*, a Governor appointed the plaintiff as a member of the Pennsylvania Game Commission (Game Commission) in 1998 and the same Governor dismissed the plaintiff in 2000 before the expiration of the plaintiff's term. Under the then-current Game and Wildlife Code, the term of office for all of the commissioners was the same, eight years, and did not provide for staggered expiration dates. After acknowledging *Watson's* "fixed, staggered rule," this Court focused on the fact that from 1937 until 1987, the former Game and Wildlife Code had staggered terms, but the legislature created a new Game and Wildlife Code in 1998 that omitted the staggered terms and replaced them with fixed terms that concluded uniformly. *Venesky*, 789 A.2d at 865. Ultimately, this Court determined that the legislature's shift from staggered terms to non-staggered terms in the Game and Wildlife Code was a dispositive factor in ascertaining legislative intent, noting that the previous version of the Game and Wildlife Code was an "explicit, regulated statutory scheme" and that the legislative change reflected the intent to alter this scheme. *Id.* For this reason, we concluded that the Governor could remove a member of the Game Commission at his pleasure.[7]

---

7. In *Schluraff v. Rzymek*, 417 Pa. 144, 208 A.2d 239 (1965), our Supreme Court officially adopted, post-*Watson*, what is known as the "fixed term rule." In that case, the court concluded that where an officer was appointed to a Board "for a fixed term expiring simultaneously with the terms of the other appointees to the Board [this] does not come within the staggered term rule." 208 A.2d at 239 (emphasis in original).

Based upon our research, the Pennsylvania Supreme Court, in its post-*Watson* cases, has applied the "fixed term rule" only to multi-member boards or commissions and has never extended the rule to a single-person office, much less in a situation where the term of office exceeded the appointing Governor's term. *See Philadelphia v. Sacks*, 418 Pa. 193, 210 A.2d 279, 279–80 (1965) (fixed term rule, Registration Commission, each member to serve a four-year term); *Schluraff*, 208 A.2d at 239 (fixed term rule, Board for the Assessment and Revision of Taxes, each member to serve a four-year term). *See also Naef*, 227 A.2d at 890–91 (discussing the "fixed term rule" in passing and noting that the city solicitors, who served four-year terms, were not appointed to a board or commission and that staggered terms were not involved; the court resolved the case on other grounds). Likewise, the Supreme Court has never extended the "fixed, staggered rule" to a single-person office. Therefore, this Court determines which rule is most analogous given the cir-

In *Bowers,* the Pennsylvania Supreme Court applied *Watson's* "fixed, staggered rule" to the Governor's dismissal of a member of the Pennsylvania Labor Relations Board. The Act[8] in effect at that time stated:

One of the original members shall be appointed for a term of two years, one for a term of four years, and one for a term of six years, but their successors shall be appointed for terms of six years each, except that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he is to succeed.

167 A.2d at 482 (quoting 43 P.S. § 211.4).

Due to the passage of time from when the Act was enacted (1937) and the appointment at issue was made (1955), the Governor in *Bowers* seemingly appointed the board member to a four-year term in order to fill the unexpired term of a vacant predecessor who was originally appointed to a six-year term. That same Governor then removed the board member before the member's term expired.

In discussing the purpose behind the "fixed, staggered rule," and concluding that the Governor could not remove the board member absent cause, the court in *Bowers* stated, in relevant part:

The legislature by providing in the Pennsylvania Labor Relations Act staggered expiration dates **for fixed terms of Board members of a duration which, if fulfilled, would extend beyond the incumbency of the appointing Governor ... evidenced a desire and intent ...** that duly confirmed members of the Pennsylvania Labor Relations Board **possess tenure for the fixed terms** for which they are appointed and **may not be removed by the Governor except** *for cause.*

167 A.2d at 483–84 (italics emphasis in original, bold emphasis added). Relying on this rationale, the *Bowers* court found that the case before it could "not be distinguished, in principle, from *Watson.*" *Id.* at 484–85.

Here, there is only one appointee, the Executive Director, who serves a fixed, six-year term, and the only staggering that could occur is between the Governor and the Executive Director. Although the terms at issue in *Venesky* were eight-year terms, the Game Commission consisted of eight members, which, unlike the instant case, could be staggered amongst themselves. In one regard, the Executive Director's six-year term is staggered vis-à-vis the four-year term of the originally appointing Governor, and the same concerns prompting the fixed, staggered rule seem to be equally present when the transcending of terms is between a single-appointee position and the Governor. Although this Court declines to extend the fixed, staggered rule to the circumstances of this case in a wholesale manner, we view the fact that the Executive Director's term exceeds the Governor's term as indicative of legislative intent that the Executive Director not be removed except for cause. Consistent with our Supreme Court's rationale in *Watson* and *Bowers,* we focus on the net effect of allowing the Governor's removal of the Executive Director without cause and find it would nullify the legislature's intent in creating terms which overlap.[9]

cumstances of this case and the fact that one individual occupies the position of Executive Director.

8. The Pennsylvania Labor Relations Act, June 1, 1937, P.L. 1168, No. 294, *as amended,* 43 P.S. §§ 211.1–211.13.

9. The Dissent believes that *McSorley v. Pennsylvania Turnpike Commission,* 390 Pa. 81,

Notably, our conclusion is bolstered by the legislature's express designation of the mandatory "shall" and its simultaneous utilization of the permissive "may" in section 1310(b) of the RTKL. *See Tyler v. King*, 344 Pa.Super. 78, 496 A.2d 16, 19 (1985) ("[I]t has long been the rule in Pennsylvania that the word 'shall,' although usually mandatory or imperative when used in a statute, may nonetheless be directory or permissive, depending upon the Legislature's intent."). In this context, the legislature's intent in differentiating the nature between an Executive Director's two terms of office is best understood as reflecting its desire that the Executive Director must or "shall" serve for a term of six years and that the Governor can or "may" decide whether to extend that into another six-year term. *See* 65 P.S. § 67.1310(b) (stating that the Executive Director "shall serve for a term of six years" and "may serve no more than two terms"); *Waros v. Borough of Vandergrift*, 161 Pa.Cmwlth. 538, 637 A.2d 731, 735 (1994) ("Particularly significant in the present case is the fact that the legislature has used both the word 'shall' and the word 'may' in the same sentence, which suggests that the legislature intended 'shall' and 'may' to have separate meanings and not to be interchangeable.").

Stated differently, section 1310(b) of the RTKL implies that the first term is mandatory and that the second term is permissive, at the discretion of the Governor, and the only time in which the Governor can decide whether to remove an Executive Director. *Cf. Meade v. City of Philadelphia*, 65 A.3d 1031, 1037–38 (Pa. Cmwlth.2013) (*en banc*). This interpretation is corroborated by the remarks of a representative of the General Assembly during floor debate. *See* Pa. Legislative Journal, Session of 2007, 191st of the General Assembly, No. 112, at 2582 (Dec. 10, 2007) (Representative Josh Shapiro) ("[A]s it relates to the executive director and **what we have tried to do to accomplish greater independence for the executive director is to vest that executive director with a six-year term, a term that does not necessarily run concurrent with one Governor or another, to create more independence for that office ....**") (emphasis added).[10]

Accordingly, this Court determines that an Executive Director's fixed term of six years, combined with other compelling factor(s) reflecting the legislature's intent to curtail the Governor's removal power, supports the conclusion that the Executive Director can only be removed for cause.

134 A.2d 201, 203 (1957), somehow confined or undermined the fixed-staggered rule by reproducing a phrase from that case where the Court found that the appellant's argument was "based upon a disregard of the restricted scope of the ruling in the *Watson* case." (Dissent op. at 402, 406.) In *McSorley*, the appellant was indicted on criminal counts; the Governor suspended him from the Pennsylvania Turnpike Commission; the appellant contended that the Governor could not suspend or remove him at all, even *for cause;* and our Supreme Court concluded that a Governor could always suspend or remove an appointee *for cause.* Ultimately, the Dissent quotes *McSorley* out of context and that case does not provide this Court with any guidance with

respect to the fixed-staggered rule, much less prohibit or counsel against the direction we have taken.

**10.** The Statutory Construction Act specifically authorizes consideration of legislative history when construction of a statute, beyond its plain language, is required. *See* 1 Pa.C.S. § 1921(c)(7). Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history. *Board of Revision of Taxes v. City of Philadelphia*, 607 Pa. 104, 4 A.3d 610, 624 n. 10 (2010); *Commonwealth v. Wilson*, 529 Pa. 268, 602 A.2d 1290, 1294 n. 4 (1992).

## Independent Quasi–Judicial Agency

█ However, our review does not end here. When the legislature creates an independent administrative agency that exercises quasi-judicial functions, this is a strong indicator that the legislature intended that the agency's members be removed only for cause. The rationale for inferring such intent is that if an agency is sufficiently independent from the executive, the executive should not have control or coercive influence, direct or indirect, over the agency when the agency performs the quasi-judicial function of adjudicating the statutory rights of parties in accordance with legislative standards. *See Bowers,* 167 A.2d at 484 (considering the Pennsylvania Labor Relations Board, its administrative expertise, and the nature of its adjudicatory functions and concluding: "It is plain enough that, in the public interest, such Board members were not to be made amenable to political influence or discipline in the discharge of their official duties."); *Commonwealth ex rel. Schofield v. Lindsay,* 330 Pa. 120, 198 A. 635, 636 (1938) (stating that the power of removal is usually correlative with the power of appointment, "except in those cases where the public welfare requires that an official charged with important governmental functions should be protected against interference on the part of the executive"). *See also* section 102 of the Judicial Code, 42 Pa.C.S. § 102 (defining "Independent Agency" as the "Boards, commissions, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy, supervision, and control of the Governor" and stating that an "Executive Agency" is not an "independent agency.").[11]

11. In pertinent part, section 1310 of the RTKL, creating the office of the Executive Director, makes clear the intended independence of this public officer:

> **(c) Limitation.—The executive director shall not seek election nor accept appointment to any political office during his tenure as executive director and for one year thereafter.**
>
> (d) Staffing.—The executive director shall appoint attorneys to act as appeals officers and additional clerical, technical and professional staff as may be appropriate and may contract for additional services as necessary for the performance of the executive director's duties. The compensation of attorneys and other staff shall be set by the Executive Board. The appointment of attorneys shall not be subject to the act of October 15, 1980 (P.L.950, No.164), known as the Commonwealth Attorneys Act.
>
> (e) Duties.—**The executive director shall ensure that the duties of the Office of Open Records are carried out and shall monitor cases appealed to the Office of Open Records.**
>
> (f) Appropriation.—**The appropriation for the office shall be in a separate line item and shall be under the jurisdiction of the executive director.**

Section 1310(c)-(f) of the RTKL, 65 P.S. §§ 67.1310(c)-(f) (emphasis supplied).

The RTKL further lists the functions of the OOR as follows:

> (1) Provide information relating to the implementation and enforcement of this act.
>
> (2) Issue advisory opinions to agencies and requesters.
>
> (3) Provide annual training courses to agencies, public officials and public employees on this act and 65 Pa.C.S. Ch. 7 (relating to open meetings).
>
> (4) Provide annual, regional training courses to local agencies, public officials and public employees.
>
> (5) Assign appeals officers to review appeals of decisions by Commonwealth agencies or local agencies, except as provided in section 503(d), filed under section 1101 and issue orders and opinions. The office shall employ or contract with attorneys to serve as appeals officers to review appeals and, if necessary, to hold hearings on a regional basis under this act. Each appeals officer must comply with all of the following:
>
> (i) Complete a training course provided by the Office of Open Records prior to acting as an appeals officer.

Based upon the OOR's essential nature and express statutory duties, the courts of this Commonwealth have already held that the OOR is a quasi-judicial tribunal. *Office of Governor v. Donahue*, 626 Pa. 437, 98 A.3d 1223, 1233 (2014) ("[T]he OOR is a quasi-judicial tribunal"). *See generally Office of Open Records v. Center Township*, 95 A.3d 354, 356 (Pa.Cmwlth.2014) (*en banc*) (discussing the OOR's fact-finding functions, procedural discretion for deciding appeals, and role as a quasi-judicial agency).[12] More specifically, the OOR possesses unique administrative expertise in a specific area of the law, and is commanded by the legislature with the obligation of applying the provisions of the RTKL and issuing determinations that adjudicate the parties' statutory rights pertaining to the disclosure of documents. *Donahue*, 98 A.3d at 1235 (noting that the OOR interpreted section 901 of the RTKL in "its adjudication of a case before it as a

quasi-judicial tribunal"); *Center Township*, 95 A.3d at 363–64. All of the OOR's collateral, secondary duties, such as providing annual training courses to agencies, establishing an internet website, conducting reviews of fees charged under the RTKL, reporting on its activities to the Governor and the General Assembly, and potentially adopting procedures for appeals, 65 P.S. § 67.1310(a)(3)-(4), (7), (9); 65 P.S. § 67.1102(b)(2), are done in the discharge and effectuation of its quasi-judicial, adjudicatory role.

 Although this Court can act as the fact-finder in appeals from the OOR, the RTKL presumes that OOR appeals officers will determine, in the first instance and as a matter of fact, whether a document should be disclosed; the OOR has wide discretion with respect to the procedure for deciding appeals; and an OOR appeals officer has discretion to hold a hearing, can accept and assess evidence

---

(ii) If a hearing is necessary, hold hearings regionally as necessary to ensure access to the remedies provided by this act.
(iii) Comply with the procedures under section 1102(b).
(6) Establish an informal mediation program to resolve disputes under this act.
(7) Establish an Internet website with information relating to this act, including information on fees, advisory opinions and decisions and the name and address of all open records officers in this Commonwealth.
(8) Conduct a biannual review of fees charged under this act.
(9) Annually report on its activities and findings to the Governor and the General Assembly. The report shall be posted and maintained on the Internet website established under paragraph (7).
65 P.S. § 67.1310(a).
 Under the RTKL, an OOR appeals officer is required to "[r]eview all information filed relating to the request." Section 1102(a)(2) of the RTKL, 65 P.S, § 67.1102(a)(2). The appeals officer "may hold a hearing" and "may admit into evidence testimony ... and documents that

the appeals officer believes to be reasonably probative and relevant to an issue in dispute." *Id.* In addition, the OOR can "adopt procedures relating to appeals." Section 1102(b)(2) of the RTKL, 65 P.S. § 67.1102(b)(2). To date, the OOR has not done so, and "[i]n the absence of a regulation, policy or procedure governing appeals ... the appeals officer shall rule on procedural matters on the basis of justice, fairness and the expeditious resolution of the dispute." Section 1102(b)(3) of the RTKL, 65 P.S. § 67.1102(b)(3). Finally, an appeals officer must issue a final determination on the matter within 30 days and provide a written explanation of the reason for the decision. Section 1101(b)(1), (3) of the RTKL, 65 P.S. § 67.1101(b)(1), (3).

12. In *Center Township*, this Court discussed in detail the duties of the OOR and concluded that the OOR "is a quasi-judicial tribunal." *Id.* at 363–64. Our Supreme Court, too, has denoted the OOR as such. *Donahue*, 98 A.3d at 1233. The Dissenting author, who joined the majority in *Center Township*, now asserts that "the OOR is not a quasi-judicial agency." (Dissent op. at 407).

that is deemed probative, is charged with the duty to determine whether a privilege is applicable, and is obligated to rule on all procedural issues related to the disposition of the matter. *Center Township*, 95 A.3d at 369–70. *See Bowling v. Office of Open Records*, 621 Pa. 133, 75 A.3d 453, 467–73 (2013). The procedures and manner in which the OOR appeals officers decide appeals are traditional quasi-judicial functions. *Center Township*, 95 A.3d at 363–64.

■■■ While the OOR's determinations may be appealed to this Court for *de novo* review, this does not in any way undermine or alter the basic character of the OOR and its status as a quasi-judicial tribunal. *See Chisholm v. Defense Logistics Agency*, 656 F.2d 42, 47 (3d Cir.1981) ("[W]hen an administrative agency acts as a quasi-judicial body, it fulfills the same function as a court, seeking to make a determination which is consistent with the public interest as reflected in the governing statute."). *See also Feingold v. Bell of Pennsylvania*, 477 Pa. 1, 383 A.2d 791, 793 (1977) ("When the Legislature has seen fit to enact a pervasive regulatory scheme and to establish a governmental agency possessing expertise ... to administer that statutory scheme, a court should be reluctant to interfere in those matters and disputes which were intended by the Legislature to be considered, at least initially, by the administrative agency."). Indeed, without any involvement by a court of common pleas or this Court, the OOR's determinations can obtain final and binding status.

As part of his duties, the Executive Director is vested with some administrative responsibilities, such as general staffing, the appointment of appeals officers, and expending appropriated funds, 65 P.S. §§ 67.1310(d), (f), but these are incidental to the Executive Director's express and foremost "duties" to "ensure that the duties of the [OOR] are carried out" and to "monitor cases appealed to the [OOR]." 65 P.S. § 67.1310(e). While there may be varying dictionary definitions for the term "monitor;" the most common meaning is "to observe critically; oversee; supervise," Random House Dictionary of the English Language, 862 (College ed.1969), and a "quasi-judicial duty" is "[a] discretionary judicial duty that a nonjudicial officer may perform under some circumstances." Black's Law Dictionary, 581 (9th ed.2009).

Consequently, the Executive Director has the responsibility and power to exercise a quasi-judicial duty, which may also be reflected in a gate-keeping manner, and the Executive Director is part and parcel of the OOR's quasi-judicial mandate. In conferring these statutory obligations, and creating an agency that is structurally and functionally independent of the executive branch (discussed below), the legislature expressed the intent to create an administrative body that is "not to be made amenable to political influence or discipline in the discharge of their official duties." *Bowers*, 167 A.2d at 484. *See Schofield*, 198 A. at 636. In order for the OOR and the Executive Director to fulfill their quasi-judicial duties in the fairest and most impartial manner possible, they must be viewed as belonging outside the sphere of executive branch control and the influence of the Governor's removal power except for cause.[13]

---

**13.** In *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (unanimous), and *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958) (unanimous), the United States Supreme Court concluded, at the very least, that where Congress creates an agency to perform "quasi-judicial" tasks, and fixed the term for the agency's members, the President could not remove the members absent cause.

## Political Limitation

This conclusion is further underscored by the fact that the legislature intended to immunize the Executive Director from party politics and essentially converted the position of the Executive Director into a non-partisan office by barring the Executive Director from seeking political office.

*See* Parker, The Removal Power of the President and Independent Administrative Agencies, 36 Ind. L.J. 63, 66 (1960) (stating that "[i]n *Humphrey's* case a statutorily fixed tenure of office was involved" and concluding that "*Wiener v. United States* has extended the *Humphrey* rule to quasi-judicial agencies whose members have no fixed statutory term"), *and compare with Kalaris v. Donovan,* 697 F.2d 376, 395 (D.C.Cir.1983) ("*Humphrey's Executor,* which was the foundation of the *Wiener* decision, went to great lengths to limit its holding to cases where Congress had defined fixed terms for agency members.") (citation omitted). *See also Federal Election Commission v. NRA Political Victory Fund,* 6 F.3d 821, 826 (D.C.Cir.1993); *Allman v. Padilla,* 979 F.Supp.2d 205, 215–20 (D.P.R. 2013).

Although grounded in statutory construction, an essential basis for the court's conclusions in *Humphrey's* and *Wiener* was the separation of powers doctrine. *Pievsky v. Ridge,* 921 F.Supp. 1335, 1340 (M.D.Pa.1996) *aff'd* 98 F.3d 730 (3d Cir.1996). *See also Portland Audubon Society v. Endangered Species Committee,* 984 F.2d 1534, 1546–47 (9th Cir. 1993); *Borders v. Reagan,* 518 F.Supp. 250, 263 (D.D.C.1981). In this regard, the court in *Humphrey's* and *Wiener* focused on the character of the office and concluded that where Congress creates a quasi-judicial agency, the agency "cannot in any proper sense be characterized as an arm or an eye of the executive." *Humphrey's,* 295 U.S. at 628, 55 S.Ct. 869.

In *Bowers,* then Chief Justice Jones of the Pennsylvania Supreme Court, writing for himself only, articulated the view that the Governor could not remove, without cause, a member of the Pennsylvania Labor Relations Board because this would infringe upon the separation of powers doctrine:

> It is implicit in the American form of government, as ordained by the Constitution of both the United States and Pennsylvania, that the government consist of three co-ordinate branches, legislative, executive and judicial, and that one branch should not impinge on the province of another. Any interference by a member of the executive department of government with the tenure of an incumbent member of a quasi-judicial board or commission would plainly offend against this basic constitutional concept. The Supreme Court has twice declared that the President of the United States lacks power to remove without cause an appointed member of an administrative agency which possesses and exercises judicial powers: *Wiener v. United States,* 357 U.S. 349, 352, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); *Humphrey's Executor v. United States,* 295 U.S. 602, 627–628, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). For the same reasons, the Governor of Pennsylvania may not remove without cause an appointee to an administrative board or commission which, as authorized by law, is invested with judicial powers and duties.

*Bowers,* 167 A.2d at 483–85 (Jones, C.J., specially concurring). Later, in *Daly v. Hemphill,* 411 Pa. 263, 191 A.2d 835 (1963), a majority of the Pennsylvania Supreme Court arguably adopted *Humphrey's* rationale.

For purpose of this appeal, this Court need not formally adopt, as a matter of state constitutional law, *Humphrey's* and *Wiener's* ultimate holdings. We note, however, that for all intents and purposes, the Governor's removal power under Article VI, Section 7 of the Pennsylvania Constitution parallels the President's removal power under the United States Constitution. This is because both the Governor and the President have the authority to remove those whom they appoint and both the Pennsylvania legislature and Congress can limit that removal power by enacting legislation expressing the intent to do so. *See Pievsky,* 921 F.Supp. at 1339–40 (noting that federal law and Pennsylvania law mimic each other in that both adhere to the following two principles: (1) that "in the face of statutory silence, the power of removal presumptively is incident to the power of appointment," and (2) the federal and state legislatures can by statute limit the executive branch's authority to remove officials at will). Given that the two constitutions are functionally indistinguishable, *Humphrey's* and *Wiener* admittedly "offer support for the majority's position." (Dissent op. at 408 n. 8.)

during his tenure and for one year thereafter. 65 P.S. § 67.1310(c). This ban on the Executive Director's constitutional right to seek political office, *see generally Randall v. Scott*, 610 F.3d 701 (11th Cir.2010), was clearly intended to prohibit the Executive Director from using his position for political gain. An absurd result would occur if an Executive Director could be removed without cause after just one week in office because the Executive Director would sacrifice, without any fault on his part, an entire year of post-employment political endeavors for relatively disproportionate time and commitment to the position.[14]

## Structural and Functional Independence

In addition, the OOR and the Executive Director are structurally and functionally independent of the executive department.

Article IV, Section 1 of the Pennsylvania Constitution states:

> The Executive Department of this Commonwealth shall consist of a Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer and Superintendent of Public Instruction and such other officers as the General Assembly may from time to time prescribe.

PA. CONST. art. IV, § 1.

Section 201(a) of the Administrative Code of 1929 (Administrative Code) declares that "the executive and administrative work of this Commonwealth shall be performed by the Executive Department, consisting of the Governor," and, among other entities, the DCED. Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 61(a).[15] The RTKL provides that the establishment of the OOR is in the DCED. Section 1310(a) of the RTKL, 65 P.S. § 67.1310(a) ("Establishment.—There is established in the Department of Community and Economic Development [DCED] an Office of Open Records.").

As Governor Wolf correctly points out, the OOR is housed as a subagency within the DCED and the legislature did not expressly designate the OOR an "independent agency" within the RTKL. However,

14. The Dissent's attempt to analogize the political limitation provision of section 1310(c) of the RTKL with section 1103 of the Public Official and Employee Ethics Act, 65 Pa.C.S. § 1103, is far from apt. (Dissent op. at 408.) There is a remarkable difference between an outright ban on the constitutional right to run for public office and a restriction that essentially states that, for a limited duration, a former public employee cannot work on private sector matters that he worked on while he was a public employee.

15. This provision provides in its entirety: "**The executive and administrative work of this Commonwealth shall be performed by the Executive Department, consisting of the Governor,** Lieutenant Governor, Secretary of the Commonwealth, Attorney General, Auditor General, State Treasurer, **and** Secretary of Education; by the Executive Board, and the Pennsylvania State Police; by the following administrative departments: Department of State, Office of Attorney General, Department of Corrections, Department of the Auditor General, Treasury Department, Department of Education, Department of Military Affairs, Insurance Department, Department of Banking, Department of Agriculture, Department of Transportation, Department of Health, Department of Drug and Alcohol Programs, Department of Labor and Industry, Department of Aging, Department of Public Welfare, Department of General Services, Department of Revenue, **Department of Community and Economic Development,** Department of Environmental Protection and Department of Conservation and Natural Resources; and by the following independent administrative boards and commissions: Pennsylvania Game Commission, Pennsylvania Fish and Boat Commission, State Civil Service Commission, Pennsylvania Public Utility Commission and the Pennsylvania Securities Commission." 71 P.S. § 61(a) (emphasis added).

section 503 the Administrative Code states that:

> Except as otherwise provided in this act, departmental **administrative bodies,** boards, and commissions, within the several administrative departments, **shall exercise their powers and perform their duties independently** of the heads or any other officers **of the respective administrative departments with which they are connected** . . . .

71 P.S. § 183 (emphasis added).

Pursuant to this statutory provision, the OOR and the Executive Director, collectively a quasi-judicial "administrative body," perform their functions independently of the DCED. *See United States Steel Corp. v. Department of Environmental Resources*, 65 Pa.Cmwlth. 103, 442 A.2d 7, 8–9 (1982) (concluding that under section 503 of the Administrative Code, the Environmental Quality Board, a sub-agency, is an independent body separate from the Department of Environmental Resources, the larger agency, when it acts pursuant to its statutory powers and duties to adopt and promulgate regulations). Since the OOR and the Executive Director operate independently of the DCED, and the DCED is the only tie that the OOR has to the executive branch, *a fortiori*, the OOR must also be independent of the executive branch. Therefore, by virtue of section 503 of the Administrative Code, the OOR is an independent agency that is structurally located outside of the executive department.

The Executive Director also receives from the legislature a direct appropriation to fund the OOR and has the sole authority to manage this appropriation. 65 P.S. § 67.1310(f). Ultimately, the legislature's method of funding the OOR further supports the view that the OOR is independent from the executive branch. Neither the Governor nor the DCED disburse monies to the OOR from their general funds, and, as a result, they are unable to influence the Executive Director and the OOR through the "power of the purse." *See* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L.Rev. 15, 30, 42–43 (2010) (concluding that one way to insulate an agency from the control of the executive is to "provide agencies with an independent funding source.").

Moreover, neither the OOR nor the Executive Director performs quintessential executive duties or participates in policy making. The OOR is not a regulatory or enforcement regime in the sense that it implements binding regulations and/or prosecutes those who disobey the law. For example, in *Department of Environmental Protection v. North American Refractories Co.*, 791 A.2d 461 (Pa.Cmwlth. 2002), this Court determined that the Department of Environmental Protection (Department) and the Environmental Hearing Board (EHB) represent two different intra-agency branches of government. We stated that the "Department is the executive branch, assigned various duties to implement and enforce environmental statutes and regulations," while, on the other hand, the "EHB is the judicial branch, empowered to hold hearings and issue adjudications on orders, permits, licenses or decisions of the Department." *Id.* at 462. After noting that the EHB is "an independent quasi-judicial agency," *id.*, we concluded that:

> [W]hen the legislature invests an actor [*i.e.*, a governmental entity] with adjudicative authority only, courts may not infer that the legislature intended the adjudicative actor to use its authority to play a policy-making role. Rather, the more plausible inference is that the legislature intended to delegate the adjudicative actor the type of nonpolicy-

making adjudicatory powers typically exercised by a *court* in the agency-review context.

*Id.* at 465–66 (emphasis in original); *accord Tire Jockey Service, Inc. v. Department of Environmental Protection,* 591 Pa. 73, 915 A.2d 1165, 1187 (2007). Accordingly, this Court in *North American Refractories Co.* determined that because the EHB was solely an adjudicatory body, our legislature never intended to grant the EHB the power to assume an executive or policy-making role.

Our decision in *North American Refractories Co.* illustrates the demarcation between executive agencies and their functional purpose to regulate and/or execute the law or engage in policy making versus an independent quasi-judicial agency and its functional purpose to apply the law as written and to adjudicate matters. *See Commonwealth v. Sessoms,* 516 Pa. 365, 532 A.2d 775 (1987) ("[E]xecutive branch agencies exist to carry out functions committed to the executive power, that is, executing or administering the law."); *Cutler v. State Civil Service Commission (Office of Administration),* 924 A.2d 706, 711–12 (Pa.Cmwlth.2007) ("The Governor's power is to execute the laws and not to create or interpret them.") (citation omitted).

The OOR is inherently independent from the Executive branch; it is not au-thorized to perform any traditional executive functions; it does not set policy; and it has no role or statutory authority to operate as a regulatory or enforcement regime. Rather, the OOR's function lies outside the realm of the executive department, and the OOR's predominate purpose is to serve as a quasi-judicial, independent agency that is "not subject to the policy supervision and control of the Governor." 42 Pa.C.S. § 102.[16] Therefore, we also glean the legislature's intent for the OOR to function as an agency independent from the executive branch based on the OOR not performing any duties associated with the executive branch.[17]

### OOR and the Governor's Office

An additional significant factor in bolstering this conclusion is that the OOR adjudicates disputes involving the Governor and the Executive Department in general. Section 1310(a)(5) of the RTKL states that the OOR shall "[a]ssign appeals officers to review appeals of decisions by Commonwealth agencies or local agencies." 65 P.S. § 67.1310(a)(5). In turn, section 102 of the RTKL defines "Commonwealth agencies" as:

"Commonwealth agency." Any of the following:

(1) **Any office, department, authority, board, multistate agency or commis-**

---

16. This is in stark contrast to those policy-making, cabinet-level, executive positions that exercise a quasi-judicial role secondary (or "on the side") to their primary duty to directly serve the Governor and implement the Governor's agenda. We have no quarrel with the Dissent's contention that, as some of the Governor's closest advisors, the Secretary of the Department of Human Services and the Insurance Commissioner can be removed without cause. (Dissent op. at 407). Notably, our opinion leaves ample room for a different result when it comes to agency heads/members that are located squarely within the exec-utive branch and exercise executive duties even if some of those duties are quasi-judicial in nature.

17. In concluding that the OOR and the Executive Director are structurally and functionally an independent agency, and considering this as a factor in the present circumstances, our decision is entirely consistent with *Venesky.* Indeed, the *Venesky* court never held that agency independence was an inappropriate factor, but, instead, accepted it as legitimate indicia of legislative intent to be balanced against other factors.

sion of the executive branch; an independent agency; and a State-affiliated entity. The term includes:

(i) The Governor's Office.

(ii) The Office of Attorney General, the Department of the Auditor General and the Treasury Department.

(iii) An organization established by the Constitution of Pennsylvania, a statute or an executive order which performs or is intended to perform an essential governmental function.

65 P.S. § 67.102 (emphasis added).[18]

Naturally, the fact that the OOR is specifically obligated to decide appeals from the Governor's Office and various other executive agencies raises serious concerns and may create conflicting positions and adversarial relationships between the OOR and the executive branch. For instance, if a Governor could remove an Executive Director of the OOR at will, the Governor could conceivably install an Executive Director who ensures that the OOR would render decisions favorable to the Governor's office and the executive branch in general. Although this is an abstract possibility, if exercised, the Governor could effectively frustrate the very purpose of the RTKL to promote government transparency and open access to public documents. *See SWB Yankees LLC v. Wintermantel*, 615 Pa. 640, 45 A.3d 1029, 1042 (2012) (stating that the objective of the RTKL "is to empower citizens by affording them access to information concerning the activities of their government.").

An example of the adversary nature between the Governor and the OOR could be found in *Office of Governor v. Donahue.* In that case, the Office of the Governor commenced, and successfully litigated, a declaratory judgment action against the OOR with respect to the OOR's interpretation and application of a provision of the RTKL. *See Donahue,* 98 A.3d at 1234 ("Here, OOR, an administrative agency, proffered an interpretation of Section 901 of the RTKL in its *Donahue* decision that immediately and detrimentally impacted [the Office of the Governor].").

In *Office of the Governor v. Scolforo,* 65 A.3d 1095, 1103 (Pa.Cmwlth.2013) (*en banc* ), this Court affirmed the OOR's determination requiring the Governor to disclose his calendar schedule in un-redacted form, finding that the Office of the Governor made an insufficient evidentiary showing.

■ These examples highlight the basis for the legislature's intent that the OOR and the Executive Director be completely independent from the executive branch and the Governor's removal power, except for cause. Indeed, in discerning legislative intent, we do not presume results which would seem absurd. *See* section 1922(1) of the Statutory Construction Act, 1 Pa.C.S. § 1922(1). To presume **theoretically** that the legislature would permit a governor to exercise coercive control over the inner-workings and dispositional tendencies of the OOR, and potentially deny to the public access to documents

18. "However, judicial agencies, legislative agencies, the Attorney General, State Treasurer, and Auditor General (all Commonwealth agencies); and the district attorneys of each county (all local agencies), shall designate their own appeals officers to hear appeals from the respective agency's determinations. [Section 503(a)-(d) of the RTKL,] 65 P.S. § 67.503(a)-(d). Thus, appeals from final determinations of these … agencies are not heard by the OOR." *Bowling,* 75 A.3d at 457. In terms of state-level agencies, the legislature, by exempting judicial and legislative agencies from the jurisdiction of the OOR, *Bowling,* 75 A.3d at 457, vested the OOR with the primary responsibility of adjudicating whether records from the executive branch should be disclosed to the public.

that it is otherwise entitled to, would be an absurd result.[19]

■■■ By enacting the RTKL, the legislature created a scheme whereby public citizens have the right to request documents from the Governor's office and the executive branch; and the OOR is tasked with determining, in the first instance, whether the documents are properly withheld. In this regard, the OOR is genuinely a unique administrative agency—it is not a typical administrative agency in the sense that it is a regulatory and/or enforcement regime that deals, on a policy level, with general public interest such as child welfare, entitlements, the environment, the cost of utilities, etc. Rather, the OOR is specifically obligated to assume the sensitive and delicate task of adjudicating the disclosure or non-disclosure of government documents, and the legislature intended the RTKL to provide independence to accomplish this function "to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *Pennsylvania State Police v. McGill,* 83 A.3d 476, 479 (Pa.Cmwlth.2014).

### *Venesky, Schluraff,* and *Naef*

In his brief, Governor Wolf places heavy reliance on our previous decision in *Vene-*

*sky* as to the independence of the Game Commission. Section 201(a) of the Administrative Code expressly states that the Game Commission, although recognized as "an independent administrative board," is nonetheless a member of the "Executive Department." Section 201(a) of the Code, 71 P.S. § 61(a).[20] Consequently, and irrespective of its "independent" status, the Game Commission in *Venesky* was located squarely within the executive department.

Perhaps more importantly, the Game Commission in *Venesky* did not exercise quasi-judicial or adjudicatory responsibilities that resolve the disputes between parties. Rather, the Game Commission is a licensing and enforcement agency. *See, e.g.,* Sections 321, 925, and 2741 of the Game and Wildlife Code, 34 Pa.C.S. § 321 (stating that the duties and powers of the Game Commission pertain to the administration and enforcement of the Game and Wildlife Code); 34 Pa.C.S. § 925 (stating that in prosecuting violations of the Game and Wildlife Code, the district justices shall have jurisdiction to determine guilt); 34 Pa.C.S. § 2741 (governing the denial or revocation of hunting or furtaking licenses); *Unified Sportsmen of Pennsylvania ex rel. their Members v. Pennsylvania Game Commission,* 18 A.3d 373, 374 (Pa. Cmwlth.2011) (concluding that "the [Game] Commission is the executive agency

**19.** The Dissent dismisses this potential for abuse on the ground that a governor would never take such a "risk" and an Executive Director would do the same work regardless of whether he could be dismissed with or without cause. (Dissent op. at 410.) However, this assumption is beside the point and ignores the fact that it is the principle which is at stake: "For it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor,* 295 U.S. at 629, 55 S.Ct. 869. The Dissent is also worried that the Executive Director "is virtu-

ally untouchable for six years and thereby insulated from accountability to elected officials...." (Dissent op. at 413.) "All public officers are, of course, removable for cause." *Bowers,* 167 A.2d at 484.

**20.** In pertinent part, this provision provides: "**The executive and administrative work of this Commonwealth shall be performed by the Executive Department, consisting of the Governor ... and by the following independent administrative boards and commissions: Pennsylvania Game Commission ....**" 71 P.S. § 61(a) (emphasis added).

charged with the protection, propagation, management and preservation of game and wildlife in Pennsylvania and administration of the Game and Wildlife Code").

Here, unlike the Game Commission, the OOR is not expressly situated as an administrative board in the executive department, nor does it exercise typical functions thereof. Moreover, the OOR performs quasi-judicial functions, which must be exercised independently and even contrary to the interests of the Governor. These facts clearly distinguish this case from *Venesky*.

The Supreme Court's decisions in *Schluraff* and *Naef* are also relied upon by Governor Wolf and are readily distinguishable. At best, those cases applied the fixed-term rule, *see supra* 382 n. 7, without considering any of the additional factors that this Court has discussed and applied above. In addition, these cases are factually inapposite.

In *Schluraff*, apparently a plurality opinion, the state legislature enacted a law creating the Board for the Assessment and Revision of Taxes in third-class counties, directing the County Commissioners to appoint three members to the Board, and stating that all of the members were "to serve for terms of four years." 208 A.2d at 241 n. 2. According to the narrowest reading of the lead opinion and concurrence in *Schluraff*, the state legislature, by designating uniform four-year terms, did not intend to prohibit the County Commissioners from removing the Board members at their pleasure.

The lead opinion and concurrence in *Schluraff* did not address or discuss the apparent quasi-judicial nature of the Board for the Assessment and Revisions of Taxes. Nonetheless, our Supreme Court held in *Suermann v. Hadley*, 327 Pa. 190, 193 A. 645 (1937), that the Board for the Assessment and Revision of Taxes is solely

located within the executive branch and has purely executive duties. More precisely, the Supreme Court determined that the Board for the Assessment and Revisions of Taxes acts:

> in execution of the tax law and to permit the levy of the tax, a base on which it is to be applied is found by the assessing authorities in accordance with a standard fixed by the legislature. The finding of that base is purely an executive function delegated to a municipal agency [*i.e.*, the Board for the Assessment and Revision of Taxes].

*Id.* at 652. In other words, the Board for the Assessment and Revisions of Taxes is merely part of the administrative apparatus responsible for the assessment and collection of taxes, which is an executive function connected with the execution and enforcement of the tax laws. *Accord, e.g., In re Estate of Barker*, 63 Ill.2d 113, 345 N.E.2d 484, 487 (1976) ("[T]he assessment of taxes is in its nature a nonjudicial function. One with the responsibility of assessing taxes is executing revenue laws enacted by the legislature, and this traditionally is a function of the executive branch of government."); *Norby Lumber Co. v. County of Madera*, 202 Cal.App.3d 1352, 1362, 249 Cal.Rptr. 646 (5th Dist. 1988) ("The assessment of property for the purpose of taxation is a function of the executive branch of the government").

■ In this case, the OOR falls outside the scope of the executive branch, structurally and functionally. The OOR also exercises its quasi-judicial duties not to execute the law of levying taxes, but to interpret and apply the statutory rights conferred in the RTKL. As such, the differences between the Board of Revisions in *Schluraff* (an executive agency performing executive duties) and the OOR (an independent agency performing non-execu-

tive duties) are remarkably material, and *Schluraff* is unpersuasive authority.

In *Naef,* the Supreme Court addressed whether a city council could remove a city solicitor and assistant city solicitors who were appointed to a four-year term. Ultimately, the resolution of *Naef* rested upon express language in a statute granting the city council the power of dismissal and the fact that the solicitors are "an important confidant" of the city council in the administration of the city's business. 227 A.2d at 890–91.

Unlike the situation in *Naef,* the legislature in this case did not indicate that the Governor has the power to remove the Executive Director of the OOR at his pleasure; instead, as explained above, the legislature expressed its intent in the RTKL to require the Governor to remove the Executive Director for cause only.

The city solicitors in *Naef* were directly employed by the appointing authority, the city council, which, at that time, typically operated under a rubric where the executive and legislative branches were combined. *See City Council of the City of Reading v. Eppihimer,* 835 A.2d 883, 893 (Pa.Cmwlth.2003) (noting "the many forms of local government in which the legislative and executive functions are merged" and recognizing that "the City of Reading ... had a Commission form of government in which the executive and legislative functions were combined in the City Council."). Given the nature of their duties, the city solicitors were close advisors to the council and "[t]o hold that one who is unacceptable must be retained in such a position would lead to a seriously disturbed municipal sit-

uation." *Naef,* 227 A.2d at 890–91. *See Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981).

Again, in this case the OOR is structurally and functionally located outside of the branch of the appointing authority, the Executive Director is not a close confidant of or advisor to the Governor, and the Executive Director's duties do not include effectuating the Governor's policies. These factual dissimilarities further differentiate this case from *Naef* and render that case inapplicable.

### Conclusion

▪▪▪▪▪ Having reviewed all of the significant factors in discerning legislative intent, we find the following: the Executive Director serves a fixed term that exceeds the appointing Governor's term; statutory language indicates that the term is mandatory as opposed to directive; the OOR's predominate statutory purpose is to perform quasi-judicial, adjudicatory functions in which the Executive Director is directly involved; the OOR is structurally and functionally independent from the executive department; the OOR does not perform any quintessential executive duties; and most significantly, the OOR adjudicates disputes concerning the potential release of governmental documents in the possession of the Governor (which clearly reflects the legislature's intent that the Executive Director not be subject to the control of the Governor) and the executive branch in general. Based on all these factors, we find clear legislative intent that the Executive Director of OOR, an independent body, is insulated from the Governor's power to remove appointees at will.[21] Since Governor Wolf does not contend that

**21.** The Dissent proclaims that the Majority succumbs to folklore and is guided "by the sirens call," (Dissent op. at 397), but there is nothing mythical about our decision or the case law that sustains it. After an overview of the history of the Pennsylvania Constitution,

along with a provision dealing with Senate approval .of certain public officers, *see* PA. CONST. art. IV, § 8(a), the Dissent concedes that the issue before the Court is one of legislative intent, as our Supreme Court has consistently held since 1937. (Dissent op. at 398,

the reasons he provided in the January 20, 2015 letter constituted sufficient cause to dismiss Arneson, we grant Arneson's motion for summary relief and respectfully deny Governor Wolf's motion for summary relief.

### Relief

Having granted summary relief in favor of Arneson, we now turn to his requests for relief.

First, the Court grants Arneson's request for a declaration that Governor

Wolf's dismissal exceeded the Governor's removal power under Article VI, Section 7 of the Pennsylvania Constitution. *See Mid–Centre County Authority v. Township of Boggs*, 34 Pa.Cmwlth. 494, 384 A.2d 1008, 1011 (1978) (stating that "declaratory relief may be obtained to determine the validity and effect of the acts of public officials").

Second, the Court grants Arneson's request for a writ of mandamus. In doing so, we order that Arneson be restored to the position of Executive Director and that he

402–03). *See Weiss v. Ziegler*, 327 Pa. 100, 193 A. 642, 644–45 (1937), *accord, e.g., Burger*, 923 A.2d at 1164. The Dissent then seeks to undermine the factors that the Majority concludes collectively coalesce into a finding that the Executive Director can only be removed for cause by claiming that our decision will effectively eviscerate the Governor's removal power and infringe upon the Governor's constitutional duty to faithfully execute the law. (Dissent op. at 397, 410–11.)

However, this Court and the Supreme Court have already recognized that although the legislature has the general authority to limit the removal power, the legislature cannot restrict the Governor's removal power when it comes to executive officials who are clearly under the influence and control of the Governor because this would violate the separation of powers doctrine. *See Venesky*, 789 A.2d at 865 (referencing *Pievsky*, 98 F.3d at 737). *See also Morrison v. Olson*, 487 U.S. 654, 690–91, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Commonwealth ex rel. Attorney General v. Benn*, 284 Pa. 421, 131 A. 253, 259 (1925). As a result, a governor can dismiss, at-will, a plethora of gubernatorial appointees within the executive branch in order to effectuate his/her political policies. The fact of the matter, not disputed by the Dissent, is that the OOR and its Executive Director perform no traditional executive functions and their duties do not involve the prosecutorial enforcement of the laws. Consequently, a governor's power to see that the laws be faithfully executed is not implicated in this case; the Dissent cites no authority to say otherwise; and upon our review, we can find none. Contrary to the Dissent's suggestion, our deci-

sion is narrow in focus and does not decide the fate of every official in an administrative agency in this Commonwealth appointed by the Governor. Instead, our decision only deals with the OOR and the Executive Director of the OOR.

The Dissent also postulates a contrary rule of law that would effectively render the Governor's removal power limitless. The Dissent would permit a newly-elected Governor to erase, without any reason, countless administrative positions that are not subject to the Governor's control and need not follow the Governor's polices. Despite the Governor having no practical basis or incentive to remove these positions, the Dissent would sanction termination at-will based upon the sole fact that the Governor has the "supreme executive power." (Dissent op. at 397, 410–11.) However, as a matter of constitutional law, the reality is that the executive branch is not infinite and there is a line of demarcation where an agency does not exercise purely executive functions, and, instead, exercises the functions of an agency independent from that branch. It is at this point that the legislature can provide restrictions on a governor's removal power, whether explicitly or implicitly. This reflects the proper functioning of our separations of powers doctrine and the constitutional concept of checks and balances. Ultimately, the Dissent's position would allow a governor to exercise a removal power contrary to legislative intent, by vesting a governor with the authority to undermine the entire purpose of the RTKL and dismantle that statute's notion that government should be transparent.

We find this to be untenable.

receive unpaid salary and benefits, if any, with offsets being made to reflect actual loss of income. *Watson*, 125 A.2d at 359 (ordering agency to restore plaintiff to his position and awarding backpay where the governor exceeded his constitutional authority to remove the plaintiff).

Third, Arneson's request for a permanent injunction enjoining Governor Wolf from attempting to remove him in the future without cause is denied as unnecessary relief. Any and all other requests for relief by Arneson are denied on the basis that such relief is also unnecessary.

■ Finally, as a separate matter, the OOR has filed a cross-motion for summary relief in the nature of demurrer, averring that it should be dismissed from the case as a party-defendant because Arneson has not filed a claim against it for which relief can be granted and that the OOR is not a necessary party to the litigation. We summarily deny the OOR's motion because the OOR is a necessary party to this proceeding and is obligated, per our order, to restore Arneson to his former position and provide backpay if due. *Watson*, 125 A.2d at 359.

Judge BERNARD L. McGINLEY dissents.

Judge ANNE E. COVEY did not participate in this decision.

### ORDER

AND NOW, this 10th day of June, 2015, the motion for summary relief filed by Erik Arneson, individually and in his official capacity as Executive Director of the Office of Open Records (OOR), and the Senate Majority Caucus (together, Arneson) is GRANTED. The motion for summary relief filed by Thomas W. Wolf, in his official capacity as Governor of the Commonwealth of Pennsylvania, the De-

partment of Community and Economic Development (DCED), and the OOR (together, Governor Wolf) is DENIED. The OOR's motion for summary relief in the nature of a demurrer is also DENIED.

The Court DECREES and ORDERS the following:

1. It is hereby declared that Governor Wolf exceeded his removal power under Article VI, Section 7 of the Pennsylvania Constitution and dismissed Arneson from his position of Executive Director without the authority of law.

2. Arneson is ordered to be restored to the position of Executive Director and shall receive any backpay and benefits owing, discounting any offsets to reflect actual loss of income.

3. Arneson's request for a permanent injunction and any other relief is denied.

### DISSENTING OPINION BY President Judge DAN PELLEGRINI.

Hearing the sirens call that the only way the Right–to–Know Law (RTKL)[1] can work is if the Executive Director of the Office of Open Records (OOR) is not subject to removal by the Governor who appointed him, the majority finds that the Governor cannot remove a person from that position without cause, even though Article VI, Section 7 of the Pennsylvania Constitution says that he can. By so holding, the majority unconstitutionally interferes with the Governor's grant of authority in Article IV, Section 2 of the Pennsylvania Constitution, by which he is "vested" with the "supreme executive power" of the Commonwealth, and frustrates his ability to see that the "laws be faithfully executed." PA. CONST. art. IV, § 2. In addition to unconstitutional intrusion into the powers of the Governor, I respectfully

---

1. Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

dissent from the majority's holding because:

- by not requiring the Executive Director of the OOR to be confirmed by the Senate, that position is not an officer within meaning of Article VI, Section 1, which means that the Governor's removal power under Article VI, Section 7 regarding one of his appointees without cause is unimpeded;
- only multi-member boards and commissions with fixed and staggered terms, not an agency head with only a fixed term, are exempt from the Governor's removal power under Article VI, Section 7; and
- none of the factors posited by the majority are legally sufficient to show that the Executive Director occupies a position that has been so conditioned by the legislature as to exempt it from the Governor's removal power.

Let me explain the reasons for my dissent more fully.

### I.

### A.

The majority correctly posits that whether the Governor can remove the Executive Director of the OOR without cause

is necessarily premised on an analysis of the Pennsylvania Constitution and established precedent. There are two constitutional provisions involved in the majority's analysis: Article VI, Sections 1 and 7 of the Pennsylvania Constitution. Both of these provisions were adopted as part of the 1874 Constitution which was a product of the Constitutional Convention of 1873.[2] Both have been amended and renumbered over the years, but the language at issue is substantially the same as when adopted. Before looking at the precedent, let us first look at the history of the relevant constitutional provisions.

When adopted as part of the 1874 Constitution, Article VI, Section 1 was numbered Article XII, Section 1 and authorized the General Assembly to determine whether officers should be elected or appointed unless the Constitution provided for the method of selection. PA. CONST. art. XII, § 1 (1874) ("All officers, whose selection is not provided for in this Constitution shall be elected or appointed as may be directed by law."). This provision is nearly identical to the first sentence of an 1872 Amendment to the 1838 Constitution,[3] but it deleted a residential requirement with regard to appointed county officers. The

2. The 1873 Constitutional Convention was called for by the Act of April 11, 1872, P.L. 53. The Constitution of 1874, which was a product of the Constitutional Convention, was approved by the electorate in December 1873 and went into effect on January 1, 1874. *See* 1 Pa.C.S. § 906(a).

3. Article VI, Section 8 of the 1838 Constitution provides:

All officers whose election or appointment is not provided for in this Constitution, shall be elected or appointed as shall be directed by law. No person shall be appointed to any office within any county who shall not have been a citizen and an inhabitant therein one year next before his appointment, if the county shall have been

so long erected; but if it shall not have been so long erected, then within the limits of the county or counties out of which it shall have been taken. No member of Congress from this state or any person holding or exercising any office or appointment of trust or profit under the United States, shall at the same time hold or exercise any office in this state, to which a salary is, or fees or perquisites are by law annexed; and the Legislature may by law declare what State offices are incompatible. No member of the Senate or of the House of Representatives, shall be appointed by the Governor to any office during the term for which he shall have been elected.

PA. CONST. art. VI, § 8 (1838).

other provisions were moved to other Sections of what was then Article XII.

Now renumbered as Article VI, Section 1, the provision is identical to the text adopted in 1874: "All officers, whose selection is not provided for in this Constitution, shall be elected or appointed as may be directed by law." PA. CONST. art. VI, § 1.

Although the provision now reads the same as it did when originally adopted, this was not always the case. In 1909, a clause was added that read: "Provided, That elections of State officers shall be held on a general election day, and elections of local officers shall be held on a municipal election day, except when, in either case, special elections may be required to fill unexpired terms." PA. CONST. art. XII, § 1 (1909). That language was eliminated by an amendment in 1966 so that elections could be scheduled by statute. *See* PA. CONST. art. VI, § 1 (deleting the language added in 1909 and renumbering former Article XII, Section 1 as Article VI, Section 1).

The original intent behind the provision and its plain language sought to enable the General Assembly to create new offices not provided for in the Constitution and to decide whether to elect or appoint officials to those offices. The rest of Article XII addressed who was disqualified from holding elected or appointed offices. PA. CONST. art. X, §§ 2–3 (1874). That is it. It had nothing to do with removal of officers because that was dealt with in Article VI addressing "Impeachment and Removal from Office." *See generally* PA. CONST. art. VI (1874).

Now numbered Article VI, Section 7 of the Pennsylvania Constitution, it provides, among other things, how to remove appointed officers and civil officers. PA. CONST. art. VI, § 7. This provision is not identical to its predecessor provision in the Constitution of 1838. Indeed, Article VI, Section 9 of that Constitution provided that each officer be appointed for term of years and hold his office for the term specified, being subject to removal only for just cause or conviction of a crime. PA. CONST. art. VI, § 9 (1838) ("All officers for a term of years shall hold their offices for the terms respectively specified, only on the condition that they so long behave themselves well; and shall be removed on conviction of misbehavior in office or of any infamous crime."). Nonetheless, the majority interprets the present Article VI, Section 7 in the same manner.

However, Article VI, Section 7 differs in that it allows the removal of appointed officers "at the pleasure of the appointing authorities," not only for "just cause" or a crime. PA. CONST. art. VI, § 7. When initially enacted and when considered by our Supreme Court in the cases discussed below, the sentence at issue read, "Appointed officers, other than judges of the courts of record and the Superintendent of Public Instruction, may be removed at the pleasure of the power by which they shall have been appointed." PA. CONST. art. VI, § 4 (1874). As a result of a 1966 amendment, it now reads:

All civil officers shall hold their offices on the condition that they behave themselves while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. **Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed.** All civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due no-

tice and full hearing, on the address of two-thirds of the Senate.

PA. CONST. art. VI, § 7 (emphasis added).[4]

Following this text's adoption, our Supreme Court, in *Houseman v. Commonwealth ex rel. Tener*, after explaining that this provision applied to municipal officials as well as state officers, explained the meaning of this provision:

> There was provision for removal in the old constitution as well as in the new. Section 9 of the sixth article provided that all officers for a term of years should hold their offices during good behavior and should be removed on conviction of misbehavior in office or of any infamous crime. That section, with the words "for a term of years" stricken from it, constitutes the first clause of the fourth section of the sixth article of the new constitution. It is manifest then that the words "all officers" in the old constitution were not intended to import only such as were subject to impeachment, and the argument by inference from such a supposed restriction is not applicable. But the old constitution while it provided removal as a penalty failed to declare who should exercise the power, and limited it to the cases of conviction of misbehavior in office or of an infamous crime. The fourth section of the sixth article [numbered now as article VI, § 7] of the new constitution, enlarges the power of removal and speaks with more certainty both as to the authority which shall be clothed with it, and the manner of its exercise. Under the new constitution there are three kinds of removal, to wit, on conviction of misbehavior or crime, at the pleasure of the appointing power, and for reasonable cause on the address of two-thirds of the senate. All officers are subject to the first kind, appointed officers to the second, and elected officers to the third.

> \* \* \*

> The distinction between appointed and elected officers, is one that relates merely to the source of their authority. That is, those that are appointed, not some of them but all of them, may be removed at the mere pleasure of the power that appointed them, and those that are elected, on the address of two-thirds of the senate, and by the governor. **In the latter case there must be some reasonable cause of removal, in the former, there need be none but the mere will of the appointing power. It seems to us that we would be *making, rather than construing*, the constitution if we should say that appointed municipal officers shall not be removable at the pleasure of the power which appointed them, when the plain unambiguous words of the instrument positively declare that all appointed officers shall be subject to such removal.**

100 Pa. 222, 230–31, 1882 WL 13411, at \*8 (Pa. Mar. 31, 1882) (emphasis added).

---

4. Charles R. Buckalew, a delegate to the 1873 Constitutional Convention, in his 1883 treatise entitled *"An Examination of the Constitution of Pennsylvania,"* made the following observations about this provision:

> There can be no question that the second [sentence] of this section has introduced into the Constitution a most important change relating to removals from office. Except as to a few offices mentioned therein, a power to remove from office will hereafter be inseparable from the power to appoint. The power will extend to the removal of officers appointed for fixed, statutory terms, as well as to others, and may be exercised by any inferior appointing power as well as by the Governor of the Commonwealth, in all cases within their proper sphere.

CHARLES R. BUCKALEW, AN EXAMINATION OF THE CONSTITUTION OF PENNSYLVANIA 185–86 (Philadelphia, Kay & Brother 1883).

If one considers how our Supreme Court initially interpreted this provision and one reads its plain language, it could not be any clearer. When an officer was appointed, the appointing power could remove the officer at his pleasure—for any reason whatsoever. Any other interpretation would have us "making, rather than construing," the language. *Id.*

Now I will proceed to the case law upon which the majority relies for the proposition that the Governor cannot remove one of his appointees without just cause.[5]

**B.**

I recognize that the cases relied upon by the majority show a major shift in the Supreme Court's analysis since its opinion in *Houseman,* where it first interpreted Article VI, Section 7's plain language as permitting removal of appointed civil officers at the pleasure of the appointing power, to a school of thought essentially described as "making, rather than construing, the constitution." *Id.* Nonetheless, I also recognize that I am bound by these decisions in my analysis and apply them fully here.

The Supreme Court's shift from its previous line of thinking first occurred in the seminal case of *Watson v. Pennsylvania Turnpike Commission,* 386 Pa. 117, 125 A.2d 354 (1956). In that case, the Governor attempted to remove without cause a member of the Turnpike Commission, an independent instrumentality of the Commonwealth, that can sue and be sued and whose members are appointed by the Governor for staggered terms and confirmed by the Senate.[6] His removal was apparently an effort to clean house because of a

criminal investigation underway involving certain Turnpike Commissioners. *See McSorley v. Pennsylvania Turnpike Commission,* 390 Pa. 81, 134 A.2d 201 (1957).

Not discussing the constitutional history or its initial decisions regarding removal from office and over Justice Musmanno's vociferous dissent that the majority's decision was "counter to the crystalline-clear language of the Pennsylvania Constitution," our Supreme Court stated that Article VI, Section 1 allowed the General Assembly to provide for the removal of appointed or unelected officers, regardless of the removal provisions in Article VI. *Watson,* 125 A.2d at 356–57; *id.* at 359 (Musmanno, J., dissenting).

It then enunciated that Article VI, Section 1 should be used when determining when the Governor could remove an officer at his or her pleasure stating:

> It is therefore established in this State beyond respectable controversy that, where the legislature creates a public office, it may impose such terms and limitations with reference to the tenure or removal of an incumbent as it sees fit. There is nothing in the Constitution prohibiting such action while, on the other hand, [Article VI, Section 1] expressly admits of it. Of course, where the legislature, in creating a public office, imposes no terms or limitations on the duration of an incumbent's tenure or the mode of his removal, the method of removal prescribed by [Article VI, Section 7] of the Constitution applies.
>
> The question, then, as to whether the tenure or removal of an appointee of a legislatively created office has been so

---

5. To avoid confusion and to make this discussion easier to follow, I will refer to the current Sections of the Constitution and change the citations in the internal quotes to the renumbered Sections.

6. Section 4 of the Pennsylvania Turnpike Commission Act, Act of May 21, 1937, P.L. 774, *as amended,* 36 P.S. § 652d.

conditioned by the legislature as to exempt the incumbent from removal by the Governor at his pleasure, under his constitutional power, is one of intent to be gleaned from the statute creating or regulating the office.

*Id.* at 356–57 (majority opinion).

The Court then went on to state that the General Assembly manifested its intent that the Commissioners be independent because it provided for a multimember Commission with fixed, staggered terms and that those provisions could not be given effect if the Governor could remove Commissioners at will:

> The purpose of the foregoing provision as to the terms of office of the Commissioners (i.e., those first to be appointed and thereafter their successors) is patent. It was designed so that, by the prescribed rotation, the terms of three of the four appointed members of the Commission would always be current. The Act expressly provides that three members of the Commission shall constitute a quorum who, for all purposes, shall act unanimously. Were the Commissioners to be held removable at the pleasure of the Governor, the carefully expressed scheme of term rotation would be effectually nullified. If it be countered that the Governor, in appointing to a vacancy created by his dismissal of a Commissioner, would respect the spirit of the Act and appoint a successor for the balance of the unexpired term of the dismissed Commissioner, the answer is that the power so attributed to the Governor would still violate the plain intendment of the Act. He could render all of the offices vacant at one time which, obviously, the Act was specifically designed to make impossible. To urge that such a situation would never be provoked is irrelevant to the question of the power of the Governor in the prem-

ises as affected by the Act creating the office and prescribing the tenure therefor. It follows that the attempted removal of the plaintiff from his office was without warrant of law and that he must, therefore, be restored to the position.

*Id.* at 357.

This principle has come to be known as the "fixed, staggered rule" and holds that "where the legislature creates a public office and provides that the holders of that office shall be appointed for fixed terms with staggered expiration dates, the presence of staggered terms indicates a legislative intent that the holders of the office are not removable by the appointer at his pleasure." *Schluraff v. Rzymek,* 417 Pa. 144, 208 A.2d 239, 239 (1965).

Shortly after *Watson* was decided, the issue arose in *McSorley v. Pennsylvania Turnpike Commission* as to whether the Governor could suspend Commissioners who had been indicted for misbehavior in office and criminal conspiracy to defraud the Turnpike Commission but not yet convicted. 390 Pa. 81, 134 A.2d 201, 202 (1957). The affected Commissioners brought suit, citing *Watson* and claiming that under Article VI, Section 1 of the Constitution, when the General Assembly "creates a public office, it may impose such terms and limitations *with reference to the tenure or removal* of an incumbent as it sees fit." *Id.* at 207 (internal footnote omitted). The Court rejected the Commissioners' argument that the Governor could not remove or suspend them except after impeachment or conviction, stating *"[i]t is clear that the plaintiffs' present contention is based upon a disregard of the restricted scope of our ruling in the Watson case." Id.* at 203 (emphasis added).

The *McSorley* Court then went on to hold that even though the Governor no

longer had removal power over the Turnpike Commissioners under Article VI, Section 1, the first sentence of Article VI, Section 1, which states that "officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime," nonetheless authorized the Governor to suspend those members even though not convicted of any crime. *Id.* at 204–05.

Several years after *Watson* and *McSorley* were decided, in *Bowers v. Pennsylvania Labor Relations Board,* 402 Pa. 542, 167 A.2d 480 (1961), our Supreme Court addressed whether members of the Pennsylvania Labor Relation Board could be removed at will. The Labor Relations Board members were appointed by the Governor to fixed, staggered terms and confirmed by the Senate. *Id.* at 482; *see also* Section 4(a) of the Pennsylvania Labor Relations Act, Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.4(a). This time in a 4–3 decision, applying the fixed-staggered rule, the Court held that the Governor could not remove members of the Labor Relations Board. *Bowers,* 167 A.2d at 487.

The most recent case addressing the Governor's removal power is *Venesky v. Ridge,* 789 A.2d 862 (Pa.Cmwlth.), *aff'd,* 570 Pa. 461, 809 A.2d 899 (2002), where we addressed whether a member of the Pennsylvania Game Commission could be removed without cause by Governor Ridge. The members of the Game Commission were appointed for a set term of years, subject to Senate approval, but at the time Venesky was appointed, the Commissioners' terms were not staggered. *Id.* at 863, 865; *see also* Section 301(a)-(c) of the Game and Wildlife Code, 34 Pa.C.S. § 301(a)-(c). Again, applying the "fixed, staggered rule," we held that because Commissioners were not appointed to

fixed, staggered terms, Venesky could be removed from office. *Venesky,* 789 A.2d at 864–65.

The cases discussed above share the following characteristics:

- multi-member boards;
- commission or board members who were appointed by the Governor but required Senate confirmation before they took office;
- no statutes that authorized creation of the Boards at issue had any impediment to removal of members; and
- if Board members had fixed and staggered terms, the Board members, though appointed by the Governor, were not subject to removal without cause.

## II.

Now let us take a look at whether the Governor is foreclosed from removing the Executive Director of the OOR without cause under the Supreme Court's interpretation of Article VI, Section 1, allowing the General Assembly to limit the Governor's right under Article VI, Section 7 to remove an officer at his pleasure.

Article VI, Section 1 provides, "All officers, whose selection is not provided for in this Constitution, shall be elected or appointed as may be directed by law." PA. CONST. art. VI, § 1. But when an officer is to be appointed by the Governor, Article IV, Section 8(a) provides that when the Governor appoints "officers as he shall be authorized by law to appoint … [that appointment is] subject to the consent of two-thirds or a majority of the members elected to the Senate as is specified by law." PA. CONST. art. IV, § 8(a).

"A person will be deemed a public officer if the person is appointed or elected to perform duties of a grave and important character, and which involve some of the functions of government, for a definite

term." *Werner v. Zazyczny*, 545 Pa. 570, 681 A.2d 1331, 1337 (1996). If the Executive Director is a public officer, then he would have to be confirmed by the Senate.

Unlike the officers in the previous cases who were appointed by the Governor and then confirmed by the Senate as per the constitutional mandate, the RTKL does not require that the Executive Director, once appointed by the Governor, is subject to Senate confirmation.

The absence of the confirmation requirement demonstrates that the General Assembly did not create an office within the meaning of Article VI, Section 1, and because the Executive Director's position did not require confirmation as required by Article IV, Section 8(a), the General Assembly did not create this position under its authority in Article VI, Section 1, thereby leading to the unescapable conclusion that the Governor can remove the Executive Director of the OOR "at his pleasure" under Article VI, Section 7 because there exists no restriction on his power to remove a person in that position.

### III.

Assuming that the Executive Director is an officer within the meaning of Article VI, Section 1, the question presented here is one not yet answered: Does an officer escape the Governor's without-cause removal power under Article VI, Section 7 when the officer is not part of multi-member board with staggered terms, but has two six-year terms and is not subject to Senate confirmation?

### A.

The OOR was created by Section 1310 of the RTKL. 65 P.S. § 67.1310. The Office was created within the Department of Community and Economic Development (DCED), but the appropriation for the Of-

fice is provided in a separate line item and is under the jurisdiction of the Executive Director. Section 1310(a), (f) of the RTKL, 65 P.S. § 67.1310(a), (f). The functions that the OOR is tasked with performing consist of: providing information regarding the enforcement of the RTKL; issuing advisory opinions; providing annual training courses to agencies and public officials; establishing a mediation program; establishing a website; reviewing fees; assigning hearing officers to review RTKL denials from governmental agencies; and reporting annually on the OOR's activities to the General Assembly and the Governor. Section 1310(a) of the RTKL, 65 P.S. § 67.1310(a).

Because the issue under Article VI, Section 7 is whether the Governor may remove an officer—in this case, the Executive Director—necessarily, we must focus on the attributes of the Executive Director's position to determine if it is independent. The Executive Director is appointed by the Governor for a six-year term and can serve no more than two terms. Section 1310(b) of the RTKL, 65 P.S. § 67.1310(b). Unlike in *Watson* and its progeny, the Executive Director's appointment is not subject to Senate confirmation. *See generally* Section 1310 of the RTKL, 65 P.S. § 67.1310. During one's tenure as Executive Director and for one year thereafter, the Executive Director may neither seek election nor accept appointment to any political office. Section 1310(c) of the RTKL, 65 P.S. § 67.1310(c).

The duties of the Executive Director are straightforward: to "ensure that the duties of the Office of Open Records are carried out," to "**monitor** cases appealed to the Office of Open Records," and to appoint the appeals officers who decide the appeals and the professional staff. Section 1310(e) of the RTKL, 65 P.S. § 67.1310(e) (emphasis added).

## B.

The majority concludes that the Executive Director cannot be removed from office at the Governor's pleasure under Article VI, Section 7 because the General Assembly impliedly provided the Executive Director tenure under Article VI, Section 1. Let us examine each of the reasons provided by the majority in making this finding.

### 1. The Executive Director Has a Fixed Term.

#### a.

The majority acknowledges that all of the other cases involve multimember boards and commissions whose members have fixed, staggered terms. Nonetheless, it infers from the Executive Director's fixed, six-year term, which exceeds the Governor's term, legislative intent to provide the Executive Director tenure and limit the Governor's removal of him to for-cause removal.

However, in *Watson,* the Supreme Court's rationale did not focus upon whether the commissioner's term length exceeded the Governor's term, but instead emphasized that "the carefully expressed scheme of term rotation would be effectually nullified" if without-cause removal by the Governor were permitted, thereby enabling him to "render all of the offices vacant at one time which, obviously, the [Pennsylvania Turnpike Commission] Act was specifically designed to make impossible." *Watson v. Pennsylvania Turnpike Commission,* 386 Pa. 117, 125 A.2d 354, 357 (1956). Similarly, in *Bowers,* the Supreme Court explained that staggered terms are necessary for board members to "be in a position to benefit from the coun-sel of experienced members" who acquired vast institutional knowledge over the course of their tenure. *Bowers v. Pennsylvania Labor Relations Board,* 167 A.2d at 483–84 (Pa.1961).

The majority posits that when the General Assembly provides an officer with a fixed term exceeding that of the Governor, the General Assembly has manifested its intent that the officer not be removable by the Governor absent cause. Contrary to this position, our Supreme Court has been very clear that an officer is provided such tenure only when he has to be appointed to a fixed term on a multimember board that had staggered terms for its members. *Bowers,* 167 A.2d at 484; *Watson,* 125 A.2d at 357–58.

If there were any doubt that fixed, *staggered* terms was the determinative factor in *Watson's* and *Bowers'* restriction on the Governor's ability to remove an officer he appoints without cause, that was removed by our decision in *Venesky v. Ridge,* which our Supreme Court affirmed. 789 A.2d 862 (Pa.Cmwlth.) (*en banc*), *aff'd,* 570 Pa. 461, 809 A.2d 899 (2002). In that case, Governor Ridge was permitted to remove a member of the Pennsylvania Game Commission who had a fixed, eight-year term on a multi-member commission because the commissioners' terms were not staggered. *Id.* at 864–65. Reasoning that "[a] fixed term alone does not bar removal; rather it is the staggered terms that preclude appointing power from removing an appointed official at will," we held that because the Commissioners' terms were not staggered, the Governor had the power to remove them and, presumably, the entire Commission at one time. *Id.* at 864.[7]

---

**7.** *See Schluraff v. Rzymek,* 417 Pa. 144, 208 A.2d 239, 239 (1965) (finding removable a member of the Board for the Assessment and Revision of Taxes, despite the fact that the statute creating the position, Act of June 26, 1931, P.L. 1379, 72 P.S. § 5342, *repealed by* Act of October 27, 2010, P.L. 895, then provided that "The members of said board shall

If the Governor can remove the entire Game Commission with fixed but not staggered terms without cause under Article VI, Section 7, then under *Venesky*, the Governor can remove a single officer who is in charge of an agency.

### b.

While not necessary to my conclusion that just because the Executive Director had a fixed term, he is not insulated from without-cause removal, I would go on to hold that *Watson* limited the Governor's without-cause removal of his appointees only when they serve on multi-member boards or commissions whose members have fixed and staggered terms. I believe our Supreme Court arrived at the conclusion that the Governor could not remove board members or commissioners to accommodate the independent regulatory commissions and boards that were created as part of the New Deal. This "fixed and staggered" factor is the only factor ever found to be legally sufficient to limit the Governor's power to remove his own appointees under Article VI, Section 7.

We also held in *Venesky* that even though the office had been created as an "independent administrative commission," the office had not been so conditioned by the legislature as to exempt the incumbent from removal by the Governor at his pleasure. *Venesky*, 789 A.2d at 864 (quoting Section 301(a) of the Game and Wildlife Code, 34 Pa.C.S. § 301(a)).

Moreover, our Supreme Court has not extended *Watson* to limit the Governor's removal power beyond when there are multi-member boards with fixed and staggered terms, which restriction is in accord with the Supreme Court's holding in *McSorley v. Pennsylvania Turnpike Commission*, where it noted the "restricted scope of our ruling in the *Watson* case." 390 Pa. 81, 134 A.2d 201, 203 (1957). In fact, in *Werner*, our Supreme Court stated that "Article VI, Section 7 expressly provides that it ... applies to appointed civil or public officers," which the majority finds that the Executive Director is, even though he is not confirmed by the Senate. *Werner v. Zazyczny*, 545 Pa. 570, 681 A.2d 1331, 1337 (1996).

We should not extend *Watson* in this regard; we did not do so in *Venesky* when we had the opportunity to do so, and our Supreme Court did not take the opportunity to do so when it affirmed our decision in that case. Instead, we should follow the Supreme Court's guidance in *McSorley* that *Watson* had a "restricted scope." *McSorley v. Pennsylvania Turnpike Commission*, 390 Pa. 81, 134 A.2d 201, 203 (1957).

### 2. The Executive Director Administers a Quasi–Judicial Office.

The majority finds that the Executive Director has the responsibility and power to exercise a quasi-judicial duty because he runs an office whose appeals officers purportedly perform quasi-judicial functions by reviewing appeals under the RTKL. By prescribing the OOR a quasi-judicial function, the majority finds that the General Assembly necessarily intended that the OOR's head should not be removed absent cause so as to insulate him from political influence and discipline in the discharge of his official duties to ensure that decisions

be appointed by the county commissioners of such counties to serve terms of four years each."); *see also Pievsky v. Ridge*, 98 F.3d 730, 734 (3d Cir.1996), *cert. denied*, 519 U.S. 1150, 117 S.Ct. 1085, 137 L.Ed.2d 219 (1997) (rejecting a Delaware River Port Authority

Commissioner's argument that his five-year term, which exceeded the term of the Governor, evidenced the General Assembly's intent that the Governor's power to remove him was limited, and finding "the difference in the length of terms of office ... irrelevant.").

are made in the fairest and most impartial manner possible. I disagree with the majority for the following reasons.

First and foremost, a quasi-judicial exception to the Governor's power to remove an official appointed under Article VI, Section 7 has already been rejected in *Bowers*. The notion of a quasi-judicial "exception" to the Governor's removal power comes from the position advanced by the then-Chief Justice in *Bowers*, speaking only for himself, without adoption by any other member of the Court, as the majority in this case acknowledges. *See Bowers*, 167 A.2d 480, 484–87 (Pa.1961). As Justice Cohen remarked in his dissenting opinion, that position is supported by neither the Pennsylvania Constitution nor well-settled case law. *Id.* at 498 (Cohen, J., dissenting).

Second, even if such an exception existed, the OOR is not a quasi-judicial agency because it does not issue quasi-judicial orders. A quasi-judicial order is defined as "[a]n order of a government unit, made after notice and opportunity for hearing, which is by law reviewable solely upon the record made before the government unit, and not upon a record made in whole or in part before the reviewing court." Pa. R.A.P. 102. A quasi-judicial order is for all intents and purposes an adjudication issued under the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704.

Under Section 504 of the Administrative Agency Law, a full due process hearing is required for the making of a record. 2 Pa.C.S. § 504. The OOR is expressly excluded from this provision and is not required to provide the appellant a hearing.

Section 1309 of the RTKL, 65 P.S. § 67.1309. Moreover, as the majority acknowledges, review of an OOR decision is not done by this Court or the courts of common pleas based solely on the record made before the OOR because we are required to make our own findings and can create or supplement the record in our sole discretion. *See Bowling v. Office of Open Records*, 621 Pa. 133, 75 A.3d 453, 475–76 (2013). In the end, as in other administrative agency appeals but even more so here due to our plenary review, the courts guarantee the correctness, fairness, and impartiality of the hearing.

Finally, the Executive Director's "monitoring" of the appeals officers' activities is a quasi-judicial function not indicative that he is insulated from without-cause removal by the Governor. There exist many Governor appointees engaged in true quasi-judicial functions who are subject to the removal power of the Governor. For example, Section 708(b)(28)(ii)(B) of the RTKL provides that "an individual's application to receive social services, including a record or information related to an agency decision to grant, deny, reduce or restrict benefits, including a quasi-judicial decision of the agency and the identity of a caregiver or others who provide services to the individual" is exempt from disclosure. 65 P.S. § 67.708(b)(28)(ii)(B). The ultimate decision-maker in those cases is the Secretary of the Department of Human Services, who is subject to removal by the Governor without cause. The same is true for the adjudications issued by the Insurance Commissioner.[8]

---

8. The majority cites to *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) and *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), to support its position that the General Assembly may condition removal of officers that the Governor appoints. In *Hum* *phrey's Executor*, the United States Supreme Court held that the President could not remove without cause members of the Federal Trade Commission, who had fixed and staggered terms, who were subject to Senate approval, and who were subject to a non-partisan political requirement when the body to

### 3. The Executive Director is Precluded from Holding a Party Office or Seeking Political Office Until One Year After His Tenure.

The majority contends that because the General Assembly barred the Executive Director from seeking political office during his tenure and for one year thereafter, it can be inferred that the office is nonpartisan. *See* Section 1310(c) of the RTKL, 65 P.S. § 67.1310(c). What the majority ignores is the fact that this provision does not preclude the Executive Director from engaging in partisan politics, campaigning for a party's candidates, or making political contributions; the Executive Director is only limited to not seeking office for one year after leaving governmental employment.

Moreover, just because there are restrictions on a public officer or employee does not mean that the office is so conditioned as to evidence a legislative intent that a gubernatorial appointee could not be removed without cause. Section 1103(g)-(i) of the Public Official and Employee Ethics Act imposed similar requirements on employees whether they worked one day or twenty years, providing in pertinent part:

> **(g) Former official or employee.**—No former public official or public employee shall represent a person, with promised or actual compensation, on any matter before the governmental body with which he has been associated for one year after he leaves that body.

> **(h) Misuse of statement of financial interest.**—No person shall use for any commercial purpose information copied from statements of financial interests

which they were appointed performed duties that are predominantly "quasi-legislative" and "quasi-judicial" tasks. 295 U.S. at 619–20, 626, 628–29, 55 S.Ct. 869.

The use of the qualifying term "quasi" in labeling administrative agencies "quasi-legislative," "quasi-executive," or "quasi-judicial," as the occasion requires, "to validate their functions within the separation-of-powers scheme of the Constitution" contains an implicit "confession that all recognized classifications have broken down, and 'quasi' is a smooth cover which we draw over our confusion as we might use a counterpane [bedspread] to conceal a disordered bed." *Federal Trade Commission v. Ruberoid Co.*, 343 U.S. 470, 487–488, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting).

The majority then cites to *Wiener* for the proposition that the Supreme Court extended the *Humphrey's Executor* rule to quasi-judicial agencies whose members have no fixed, staggered terms. *Wiener* involved the War Claims Commission, established by Congress to compensate internees and prisoners of war who sustained personal and property damage at the hands of the enemy in connection with World War II. 357 U.S. at 350, 354–55, 78 S.Ct. 1275; *see also* Section 1 of the War Claims Act of 1948, Act of July 3, 1948, Pub.L. 895, 62 Stat. 1240–41. The Commis-

sion was to be composed of three persons, appointed by the President and confirmed by advice and consent of the Senate, and was to wind up its affairs not later than three years after the expiration of the time for filing claims. 357 U.S. at 350, 354–55, 78 S.Ct. 1275; *see also* Section 1 of the War Claims Act of 1948, Act of July 3, 1948, Pub.L. 895, 62 Stat. 1240–41. Staggered and fixed terms were not necessary because of the short life of the Commission.

Nonetheless, these cases would offer support for the majority's position if it were not for one very important fact—the United States Constitution does not have a provision remotely similar to Article VI, Section 7 of the Pennsylvania Constitution, which gives the Governor the power to remove persons that he appoints "at his pleasure."

In response to the dissent, the majority quotes the first part of my previous sentence "that [*Humphrey's Executor* and *Wiener* ] offer support for the majority's position," but leaves off the second part of that sentence that the federal constitution does not have a provision similar to Article VI, Section 7. Different provisions and words should make a difference in comparing the United States Constitution and our own. When they are different, it does and should make a difference in the result.

required by this chapter or from lists compiled from such statements.

**(i) Former executive-level employee.**—No former executive-level State employee may for a period of two years from the time that he terminates employment with this Commonwealth be employed by, receive compensation from, assist or act in a representative capacity for a business or corporation that he actively participates in recruiting to this Commonwealth or that he actively participated in inducing to open a new plant, facility or branch in this Commonwealth or that he actively participated in inducing to expand an existent plant or facility within this Commonwealth, provided that the above prohibition shall be invoked only when the recruitment or inducement is accomplished by a grant or loan of money or a promise of a grant or loan of money from the Commonwealth to the business or corporation recruited or induced to expand.

65 Pa.C.S. § 1103(g)-(i). *But see Shaulis v. Pennsylvania State Ethics Commission,* 574 Pa. 680, 833 A.2d 123, 131–32 (2003) (holding that Section 1103(g) of the Public Official and Employee Ethics Act was unconstitutional as applied to placing restrictions upon former government attorneys and, therefore, infringes on the Supreme Court's jurisdiction to regulate attorneys' conduct). Just because the legislature imposed some restrictions on the Executive Director in the RTKL, which were minor compared to those imposed by the Public Official and Employee Ethics Act, does not mean that it intended to take away the Governor's power to remove a person without cause.

**4. The OOR and the Executive Director are Structurally and Functionally Independent of the Executive Department.**

While acknowledging that the OOR is housed as a sub-agency within the DCED and that the General Assembly did not designate the OOR as an independent agency, the majority contends that the OOR is made independent by operation of Section 503 the Administrative Code of 1929, which provides:

> Except as otherwise provided in this act, departmental **administrative bodies,** boards, and commissions, within the several administrative departments, **shall exercise their powers and perform their duties independently** of the heads or any other officers **of the respective administrative departments with which they are connected** . . . .

Act of April 9, 1929, P.L. 177, 71 P.S. § 183 (emphasis added). The majority interprets this provision to mean that the OOR must be independent of the Executive branch, evidencing legislative intent that the Governor cannot remove a gubernatorial appointee without cause.

However, as I previously noted, in *Venesky,* the Game and Wildlife Code provision creating the Game and Wildlife Commission provides that there shall be "The independent administrative commission known as the Pennsylvania Game Commission. . . ." Section 301(a)-(c) of the Game and Wildlife Code, 34 Pa.C.S. § 301(a)-(c). We note that "Independent agency" is defined in the Statutory Construction Act as "Boards, commissions, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor . . . ." *Venesky v. Ridge,* 789 A.2d 862, 864 n. 3 (Pa.Cmwlth.) *(en banc )* (quoting 2 Pa.C.S. § 101), *aff'd,* 570 Pa. 461, 809 A.2d 899 (2002). Nonetheless, we did not find that the express legislative declaration that the Game Commission was "an independent commission" sufficient to defeat the Governor's power to remove an appointee without cause because the Game

Commission's members did not have fixed and staggered terms. *Id.* at 864.

### 5. Because the OOR Decides Disputes that Involve the Release of Information from the Executive Branch, the General Assembly Must Have Intended to Provide the Executive Director with Tenure.

The majority posits that because the OOR is specifically obligated to decide appeals from the Governor's Office and various other executive agencies, concerns are raised regarding conflicting positions and adversarial relationships between the OOR and the Executive branch, which may result in a Governor removing an Executive Director without cause to ensure that the OOR renders favorable decisions. Acknowledging that this is an abstract possibility, the majority further suggests that the Governor could effectively frustrate the very purpose of the RTKL to promote government transparency and open access to public documents if his removal power is not limited in this respect. This position is incorrect for two reasons.

First, there have been disputes concerning the release of documents by the General Assembly. *See, e.g., Levy v. Senate of Pennsylvania,* 619 Pa. 586, 65 A.3d 361 (2013). The General Assembly obviously did not believe that appeals had to be heard by someone "independent" because it provided that it could appoint its own appeals officer to hear appeals from denials of requests for legislative records, with its appeals officer being removable without cause. The General Assembly could have made itself subject to the OOR but chose not to do so because, apparently, it did not want an executive-branch agency to hear legislative appeals. It also excluded from the OOR's review the judicial branch and three executive agencies headed by elected officers—the Office of Attorney General, the Department of the Auditor General,

and the Treasury Department. *See* Section 503(d)(1) of the RTKL, 65 P.S. § 67.503(d)(1). These agencies also have their own appeals officers, who are removable without cause. Simply, this is because the OOR hears requests for executive-branch records and cannot, in any way, indicate an intent on behalf of the General Assembly to preclude the Governor from removing the Executive Director without cause.

Second, the concern that the adversarial relationship between the Governor and the OOR would result in the removal of the Executive Director is illusory. A Governor would not risk the adverse publicity resulting from removal of an Executive Director to obtain a favorable decision because the Executive Director does not decide appeals, appeals officers do, and, in any event, the requestor could appeal to a court where it would resolve whether the record should be released. Again, it is the judiciary and not the Executive Director that guarantees that the law will be followed.

Finally, a comment: Mr. Arneson did not come to be appointed as the Executive Director of the OOR by being carried down from heaven on an angel's wings. He was a staff member of the Republican majority leader when he received the appointment by the outgoing Republican Governor. I do not suggest that his appointment was improper because Governors have the power to appoint up until the day their terms end, and individuals move back and forth between the Executive and Legislative branches all of the time as people in both of those branches are engaged in the business of governing.

But it is obvious that if this Governor is re-elected for a second term, Mr. Arneson will not serve a second term. Some would say that he is not "truly independent"

because he would run the OOR in a way that he would "feather his nest" for life after his term as Executive Director. However, that view would be an insult to Mr. Arneson because it presumes that he would not do his work in a nonpartisan manner with integrity just as it would be an insult to suggest that an Executive Director who can be removed without cause would not do the same. Finally, it is an insult to Governors to suggest that they would remove the Executive Director simply because he rendered an unfavorable decision.

## IV.

### A.

I also disagree with the majority's holding insofar as it finds that the General Assembly has not unconstitutionally intruded on the Governor's executive powers. The first clause of the first sentence of Article IV, Section 2 of the Pennsylvania Constitution provides that "The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed ...." PA. CONST. art. IV, § 2.

This provision does not mean that the Governor has *some of* the executive power and ensures that *some* laws are faithfully executed, but instead requires that he possess *all of* the executive power and ensures that *all* of the laws are faithfully executed. Article VI, Section 7 authorizes the Governor to remove an appointed officer "at his pleasure" to enable the Governor to carry out his constitutional mandate of ensuring that all appointed officers execute the duties the Governor entrusts them to do on his behalf—in other words, to faithfully execute all laws. PA. CONST. art. VI, § 7.

Contrary to the majority comment to the dissent, I do dispute that the release of records does not involve an executive-branch function. No matter what "quasi" label we attach, the function of deciding whether to release records entrusted or relating to the operation of the Executive branch is part and parcel of that agency's function. Before the RTKL, Executive branch secretaries or their appointed hearing officers decided whether to release public records. If the General Assembly attempted to make denials of requests for judicial records appealable to the OOR, would there be any discussion that those records were judicial in nature or that the Separation of Powers doctrine was violated? The intrusion becomes obvious in light of the fact that the General Assembly excluded itself and the judicial branch from the OOR's jurisdiction. *See* Section 503(d)(1) of the RTKL, 65 P.S. § 67.503(d)(1). The Executive branch is no less independent than the Judiciary or the General Assembly.

The net result of the majority's holding is that other executive functions that some find "unique" will be transferred to an office headed by an Executive Director with a term of years. For example, under the majority's holding, the General Assembly could create an "Office of Professional Services Contracts" headed by an Executive Director appointed by the Governor but not subject to his removal to award professional service contracts to avoid the potential for "pinstripe patronage." Similarly, the General Assembly could create an "Office of Marcellus Gas Permits" to ensure that permits are awarded on the merits and not based on the political influence yielded by drilling and environmental interests, and so on and so on. Pretty soon, there would be so many "holes" in the Governor's "supreme executive power" that it would more aptly be described as the "Swiss cheese executive power."

### B.

Over and over again, the majority advances the mantra that, notwithstanding

what the Constitution states, the Governor should not have removal power over the Executive Director because the OOR is so special that it should be "independent" of his control. While some view elimination of the Governor's without-cause removal power as advancing "independence," I see it as taking away the Executive Director's accountability to the electorate, which is anathema to a representative democracy.[9]

The majority suggests that the Executive Director could be removed for "good cause" but never defines that term, suggesting that the Governor's disapproval of the job done by the Executive Director would constitute "good cause." If only

9. In footnote 20, the majority posits that it is merely following the *Watson* test to find that the General Assembly wanted the Executive Director to be "independent." What it is doing, though, is expanding *Watson* to areas to which it was not intended to apply by ignoring that our Supreme Court in *McSorley* stated that *Watson* had a "restricted scope." *McSorley v. Pennsylvania Turnpike Commission*, 390 Pa. 81, 134 A.2d 201, 203 (1957). In *Venesky*, we followed our Supreme Court's caution to give *Watson* a restricted scope by declining to extend it where there were not staggered terms, and our Supreme Court confirmed that interpretation by affirming on appeal. *Venesky v. Ridge*, 789 A.2d 862 (Pa. Cmwlth.), *aff'd*, 570 Pa. 461, 809 A.2d 899 (2002). The majority then blithely goes on its way to apply a *Watson* analysis even though *Watson* is inapplicable to this situation. Of course, the dissent shows that even if a *Watson* analysis applies, it was not so conditioned that the Governor's removal power was limited so that the plain language of Article VI, Section 7 of the Pennsylvania Constitution should not be followed.

The majority then goes on in that footnote to attempt to limit the scope of its finding by stating that the General Assembly cannot restrict the Governor's removal power when it comes to executive officials because this would violate the separation of powers doctrine. Without saying so, the majority seems to suggest that an official, like the Executive Director, charged with seeing that a law "is faithfully executed," is not an executive official if it can be said that he exercises some "quasi" power. The last time I looked, the Constitution only has three branches—Executive, Legislative, and Judicial—and despite searching and searching, I have not been able to find a "Quasi" branch. As I have mentioned above, what *is* involved in this case are the executive powers of the Executive branch. The General Assembly acknowledged as much when it did not make its own records subject to release by the OOR, and this is also apparent from the fact that the Judiciary's records are not subject to the OOR's release. Further, I can think of no executive power more "pure" than building highways. Nonetheless, under the majority's rationale, *Watson* was wrongly decided because what was involved in that case was building a highway—the Turnpike.

Finally, the most remarkable part of the footnote is the last paragraph where the majority explains why it decides to extend *Watson* to where it has not been previously extended. It states that the dissent's position would allow the Governor to remove "countless administrative positions" "without any reason." (Majority Opinion at 396 n. 21.) As far as I know, the only position that is affected by my dissent is the Executive Director because this is the first time that any court has extended *Watson* to an office that was not confirmed by the Senate and lacks staggered terms. I think that the majority's comment is prescient, though, because the majority's decision will result in the creation of countless positions that do not exercise "purely" executive power, but rather some "quasi" power, thereby gutting the "supreme executive" power of the Governor.

But more importantly, the last paragraph of the footnote reveals that the basis for the majority's position is not a legal or constitutional one but a philosophical one—to allow the Governor to remove an official "at his pleasure" is "untenable" because it would "vest[] a governor with the authority to undermine the entire purpose of the RTKL and dismantle that statute's notion that government should be transparent." (*Id.*) Aside from this assertion being plain wrong on a factual basis, that was a decision made by the electorate when it approved the Constitution—the covenant on which we agreed to be governed—and that the plain language of the Constitution does not fall away when it comes in conflict with what the majority considers the "higher good."

that were so. The first sentence of Article VI, Section 7 provides, "All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime." PA. CONST. art. VI, § 7. Under *McSorley,* an official can be suspended if indicted or removed if convicted.[10] Other than that, there is no basis for removal. Thus, civil officers are certainly independent, in fact, more independent than judges who do not have to be indicted or convicted of a crime to be removed—but they certainly are not accountable to the public because they are not accountable in any way to a governor who answers to the citizens.

Article IV, Section 2's second clause provides that the Governor "shall be chosen on the day of the general election, by the qualified electors of the Commonwealth." PA. CONST. art. IV, § 2. This provision makes the Governor accountable to the people for executing the laws in a fair,

proper, and efficient manner insofar as the people have the power to elect. The Governor's power to remove officers that he has appointed ensures that the policies mandated by the electorate are duly executed. When we limit the Governor's removal of the Executive Director, we are left with an individual who is virtually untouchable for six years and who is thereby insulated from accountability to elected officials, a hallmark of our democracy.

Accordingly, for the foregoing reasons, I respectfully dissent.

Judges BERNARD L. McGINLEY and BONNIE BRIGANCE LEADBETTER join in this dissenting opinion.

---

**10.** The majority says that the dissent quotes *McSorley* out of context. A reading of the entire opinion shows that it limited Watson. After all, the Supreme Court did say that the allegation that the officials in that case made ignored the "restricted scope of our ruling in the *Watson* case," which was confirmed by Justice Bell's reading of the majority's opinion in his concurring and dissenting opinion. *McSorley,* 134 A.2d at 203; *see also id.* at 205–13 (Bell, J., concurring and dissenting).